574 F.2d 178
 43 A.L.R.Fed. 819
 KAISER ALUMINUM AND CHEMICAL CORPORATION
v.
The UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,
Richard O. Simpson, Individually and in his capacity as a
Commissioner of Consumer Product Safety Commission, Barbara
Franklin, Individually and in her capacity as a Commissioner
of Consumer Product Safety Commission, Lawrence Kushner,
Individually and in his capacity as a Commissioner of
Consumer Product Safety Commission, Constance Newman,
Individually and in her capacity as a Commissioner of
Consumer Product Safety Commission, R. David Pittle,
Individually and in his capacity as a Commissioner of
Consumer Product Safety Commission.
Appeal of the UNITED STATES.
 No. 77-1874.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 5, 1978.
Decided March 27, 1978.
 
 Charles S. Crompton, Jr., Potter, Anderson & Corroon, Wilmington, Del., Ronald J. Greene, Christopher R. Lipsett, Wilmer, Cutler & Pickering, Washington, D. C., Max Thelen, Jr., Fredric C. Nelson, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for Kaiser Aluminum & Chemical Corp.; Robert W. Turner, Dennis M. Day, Kaiser Aluminum and Chemical Corp., Oakland, Cal., of counsel.
 John H. Shenfield, Asst. Atty. Gen., Barry Grossman, Andrea Limmer, Attys., Dept. of Justice, Washington, D. C., Theodore J. Garrish, Gen. Counsel, Alan H. Schoem, Atty., Consumer Product Safety Comm'n, Washington, D. C., for appellants.
 Before GIBBONS and GARTH, Circuit Judges, and WEINER,* District Judge.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 The Consumer Product Safety Commission (CPSC) appeals from a judgment of the district court which declares that the Consumer Product Safety Act, Pub.L.No.92-573, 15 U.S.C. § 2051 et seq., grants CPSC no jurisdiction over aluminum branch circuit wiring or aluminum branch circuit wiring systems, and which enjoins CPSC from publishing regulations covering such products.[1] The plaintiff is Kaiser Aluminum and Chemical Corporation, a manufacturer of such products. We conclude that the court misconstrued the Act, and we reverse.
 
 
 2
 Branch circuit wiring conducts electric current from electrical panels containing fuses or circuit breakers to various terminals within a residence. These terminals include lighting fixtures, switches, and wall outlets in which the plugs of electrical appliances are inserted. Branch wiring is made of either copper or aluminum. Kaiser produces the aluminum variety and sells it to wholesalers, who in turn sell it to electrical contractors for installation in residences during construction. Once installed, it is as a rule completely enclosed in the walls of the structure.
 
 
 3
 Under the Act CPSC has regulatory authority over "consumer products." As defined in section 3(a)(1) of the Act, 15 U.S.C. § 2052(a)(1), that term means
 
 
 4
 any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise; but such term does not include
 
 
 5
 (A) any article which is not customarily produced or distributed for sale to, or use or consumption by, or enjoyment of, a consumer . . . .
 
 
 6
 Pursuant to its regulatory authority under section 5(a) of the Act, 15 U.S.C. § 2054(a), CPSC collects, analyzes, and publishes information about hazardous products. Under sections 7(b) and 9(c)(2)(A) of the Act, 15 U.S.C. §§ 2056(b) & 2058(c)(2)(A), it may also develop safety standards for consumer products and, where "reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with such product(s)," may promulgate its standards by rule. Finally, under section 15 of the Act, 15 U.S.C. § 2064, it may, after a hearing, declare certain consumer products to present "substantial product hazards."
 
 
 7
 In November, 1973, following reports of electrical failures and overheating involving aluminum branch circuit wiring, CPSC opened an investigation into the product. Public hearings were held in March and April, 1974, to determine whether further investigation and eventual regulatory action were warranted. During 1975 CPSC published expressions of concern about potential fire hazards associated with the product. On August 7, 1975, CPSC voted to commence a proceeding to develop a consumer product safety standard, and on November 4, 1975, it published a notice to that effect. 40 Fed.Reg. 51,218 (1975). That notice disclosed CPSC's concern that aluminum branch circuit wiring exposed consumers to several serious hazards, including death or injury caused by burning or asphyxiation.
 
 
 8
 In January, 1976, Kaiser commenced this action, seeking an injunction prohibiting CPSC's dissemination of information about aluminum branch circuit wiring and requiring the retraction of information previously published. In addition, Kaiser sought injunctive and declaratory relief against the further exercise by CPSC of jurisdiction with respect to the product, on the ground that it is not a consumer product. The district court accepted this contention, and this appeal followed. Kaiser relies on the plain language of the Act and on its legislative history.
 
 A. THE PLAIN LANGUAGE OF THE ACT
 
 9
 If the Act covers branch circuit wiring, it does so because that product is an "article, or component part thereof, produced or distributed . . . for the personal use . . . or enjoyment of a consumer in or around a . . . household or residence." Kaiser's first contention is that branch circuit wiring is not an "article." Rather, it contends, such wiring is a building supply material intended for incorporation in a residence and becoming a part thereof. It notes that by the dichotomy between articles and residences the Act clearly excludes buildings used as residences from the definition of consumer products. It does not follow from such exclusion, however, that the Act incorporates all the arcane knowledge about when personal property becomes a fixture and thus part of the building. If Kaiser's interpretation were correct, then many consumer products in common use such as furnaces, water heaters, dishwashers, and lighting fixtures would be excluded from coverage. We see nothing in the plain language of the Act suggesting that the word "article," a noun denoting any material thing, excludes components incorporated in a residence if they otherwise fit within the definition.
 
 
 10
 Kaiser next contends that, even if branch circuit wiring is an article, it is not an article intended for the personal use or enjoyment of a consumer in a household or residence. Rather, Kaiser urges, it is an industrial building material intended for use by the electricians who install it in a building. It certainly is that, but once installed it is just as certainly used and enjoyed by householders whenever they turn on an electric switch. That it was first used in a different way by those who erected the building does not negate the plain fact that consumers later use and enjoy it. Kaiser correctly observes that the Act intended a distinction between consumer products such as teapots and razors on the one hand and industrial products on the other. But it would be impossible for a consumer to enjoy the use of an electric razor without also enjoying the use of the branch circuit wiring to which it is connected. Kaiser points out that such a consumer also enjoys the use of the power line in the street and the utility company's electric generator, and so he does. But those articles are not used "in or around" his household, while branch circuit wiring is.
 
 
 11
 Turning to another part of the consumer products definition, Kaiser notes that it excludes nine categories of products, including "any article which is not customarily produced or distributed for sale to, or use or consumption by, or enjoyment of, a consumer."[2] This exclusion, almost a mirror image of the general definition, is hardly a model of clarity but was undoubtedly intended to exclude industrial products, on the theory that industrial purchasers are better able to protect themselves and are subject to the separate regulatory scheme enacted by the Occupational Safety and Health Act of 1970, Pub.L.No.91-596, 29 U.S.C. § 651 et seq.
 
 
 12
 The House Report on the Consumer Product Safety Act explained the exclusion as follows:
 
 
 13
 It is not intended that true "industrial products" be included within the ambit of the Product Safety Commission's authority. Thus, your committee has specifically excluded products which are not customarily produced or distributed for sale to or use of consumers. The occasional use of industrial products by consumers would not be sufficient to bring the product under the Commission's jurisdiction. The term "customarily" should not be interpreted as intending strict adherence to a quantum test, however. Your committee is aware that some products which were initially produced or sold solely for industrial application have often become broadly used by consumers. If the manufacturer or distributor of an industrial product fosters or facilitates its sale to or use by consumers, the product may lose its claim for exclusion if a significant number of consumers are thereby exposed to hazards associated with the product.
 
 
 14
 H.R.Rep.No.1153, 92d Cong., 2d Sess. 27 (1972) (emphasis in original). Kaiser established in the district court that although copper branch circuit wiring is customarily distributed through channels which make it readily available for purchase by householders, the aluminum product is significantly less available, since it is sold primarily to electrical wholesalers who sell directly to electrical contractors. The method of distribution chosen by a manufacturer for its product cannot, however, determine whether the product falls within the statutory definition. Either copper and aluminum branch circuit wiring are both consumer products, or neither is. Since both are articles used or enjoyed by consumers in or around households, both are, according to the plain language of the Act, consumer products.
 
 B. LEGISLATIVE HISTORY
 
 15
 Kaiser discerns in the legislative history of the Act an intention to leave matters of specification, composition, and design of branch circuit wiring entirely to local building codes. It is doubtful whether we should even consider that argument in view of the explicit preemption in section 26(a) of the Act, 15 U.S.C. § 2075(a).[3] But Kaiser sees in the congressional decision to exclude housing design from the coverage of the Act an intention, despite section 26, to defer to local building codes on the design of housing components. Apart from section 26, there is, however, an express congressional finding in section 2(a)(4) of the Act, 15 U.S.C. § 2051(a)(4), that local control of consumer products which move in interstate commerce is "inadequate and may be burdensome to manufacturers." To place the manufacturers of building materials at the mercy of local code draftsmen would fly in the face of clear congressional intent. Local building codes continue to play a role in regulating "the installation and use of consumer products, such as electric, gas, or plumbing appliances." Bureau of National Affairs, The Consumer Product Safety Act: Text, Analysis, Legislative History 81 (1973). But design and performance standards for components are now a matter of national concern.
 
 
 16
 The only specific evidence to which Kaiser points is the defeat, during consideration of the bill in Congress, of an amendment offered by Senator Eagleton, which would have declared mobile homes to be consumer products. Kaiser infers from the defeat of this amendment a general intention to exclude all housing components. We are unpersuaded by the dubious logic of drawing a broad intention from the rejection of a narrow amendment. Furthermore, we find persuasive evidence to the contrary. After the defeat of the Eagleton amendment, the appropriate House committee reported:
 
 
 17
 It is the committee's understanding that the definition of the term "consumer product" would include any component, equipment, or appliance sold with or used in or around a mobile home.
 
 
 18
 H.R.Rep.No.1153, 92d Cong., 2d Sess. 28 (1972).
 
 
 19
 In addition, we cannot ignore the final Report (1970) of the National Commission on Product Safety, which was established by law in 1967. Pub.L.No.90-146, 81 Stat. 466. That Report provided the basis for the later Act. In it, the Commission listed products the safety of which should be assured at the design stage. In Category XVII, "Home Structures (and) Construction Materials," it included such items as insulation materials, windows and window glass, and floors and flooring materials. In Category VI, "Home Furnishings and Fixtures," it listed electrical outlets, built-in wiring devices, and distribution systems for use in or around the household, as well as gas meters, electric meters, and attached electric light fixtures. That Congress was aware of this list is evidenced by references to it during floor debates by Congressman Moss, Chairman of the House Commerce Subcommittee on Commerce and Finance and sponsor of the bill which became the Consumer Product Safety Act. Referring to the Commission's Report, he observed:
 
 
 20
 Very serious questions were raised concerning the safety of many products not investigated by the Commission such . . . as aluminum home wiring . . . .
 
 
 21
 118 Cong.Rec. 31,378 (1972) (emphasis supplied).
 
 
 22
 Our review of the legislative history of the Act leads us to the same conclusion as that reached by the District Court for the District of Columbia, which was presented with the same question in United States v. Anaconda Co., 445 F.Supp. 486 (1977). Where the legislative history does not positively support CPSC's regulatory authority over branch circuit wiring, it is inconclusive at best. Our examination of the legislative history has, therefore, cast no doubt on our reading of the plain language of the statute.
 
 
 23
 The judgment appealed from will be reversed.
 
 
 
 *
 Honorable Charles R. Weiner, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The opinion of the district court is reported. 428 F.Supp. 177 (D.Del.1977). Although the judgment disposed of only one count (Count III) of the complaint, the district court directed the entry of a final judgment pursuant to Fed.R.Civ.P. 54(b). Thus, the appeal is properly before us. While at one time CPSC challenged the jurisdiction of the district court, it has not renewed that challenge on appeal. We have nonetheless independently considered the district court's jurisdiction and agree that jurisdiction was properly exercised for the reasons stated by that court in an earlier opinion. 414 F.Supp. 1047, 1053-57 (D.Del.1976)
 
 
 [2]
 Sec. 3(a)(1)(A) of the Act, codified in 15 U.S.C. § 2052(a)(1)(A). The other excluded categories are tobacco and tobacco products, motor vehicles, economic poisons, firearms, aircraft, boats, drugs and cosmetics, and food all covered by other regulatory statutes
 
 
 [3]
 Sec. 26. (a) Whenever a consumer product safety standard under this Act is in effect and applies to a risk of injury associated with a consumer product, no State or political subdivision of a State shall have any authority either to establish or to continue in effect any provision of a safety standard or regulation which prescribes any requirements as to the performance, composition, contents design, finish, construction, packaging, or labeling of such product which are designed to deal with the same risk of injury associated with such consumer product, unless such requirements are identical to the requirements of the Federal standard