The STATE FAIR OF TEXAS

v.

UNITED STATES CONSUMER PRODUCTS SAFETY COMMISSION.

No. CA-3-79-1367-G.

United States District Court,
N. D. Texas,
Dallas Division.

Nov. 13, 1979.

Kelly, Hart & Hallman, Fort Worth, Tex., by E. Glen Johnson, Russell B. Smith, Dallas, Tex., for State Fair of Texas.

Jeffrey S. Lynch, Christopher A. Payne, Vial, Hamilton, Koch, Tubb, Knox & Stradley, Dallas, Tex., for Steck & Stapf Attractions.

Kenneth J. Mighell, U.S. Atty., Fort Worth, Tex., Stafford Hutchinson, Asst. U.S. Atty., Dallas, Tex., John R. Fleder, Asst. Chief, Consumer Affairs Section, Anti-Trust Div., Dept. of Justice, Washington, D.C., for Consumer Products Safety Comn.

## MEMORANDUM ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

As anticipated by the court in its memorandum order of November 3, 1979, the substantive issues presented by this case, left undecided by the court's earlier decision, have again come before the court, this time ripe for resolution. In its earlier memorandum order, the court denied the application of plaintiff, The State Fair of Texas ("State Fair") for a preliminary injunction restraining the defendant, United States Consumer Product Safety Commission ("Commission") from conducting an investigation of an accident involving defendant's aerial tramway which occurred on October 21, 1979. In so doing, the court held that State Fair was not threatened with irreparable injury, inasmuch as it could legally refuse permission for an inspection of the tramway and related records, forcing the Commission to obtain an administrative inspection warrant if it wished to inspect. In light of the probability that such a warrant would be sought, the court declined to dismiss the case as unripe, choosing instead to retain jurisdiction of the underlying claim for declaratory relief until events transpired which brought those issues squarely into focus. Such an occasion has now arisen.

On November 5, 1979, the Commission sought and obtained an *ex parte* administrative inspection warrant from United States Magistrate William F. Sanderson, Jr. That warrant, based upon affidavits from Commission personnel reciting the need for an inspection and stating that permission for a warrantless inspection had been refused, authorized the Commission to enter the premises of State Fair and of its licensee, Steck & Stapf Attractions, Inc. ("S & S"), and to inspect the tramway and its components in a nondestructive manner. The

warrant also authorized inspection of nine categories of books and records within the possession, custody, or control of State Fair. The warrant was served on State Fair and S & S officials the same day, and those officials on advice of counsel refused entry pursuant to the warrant. On November 6, the Commission moved before Magistrate Sanderson for an order requiring State Fair and S & S to show cause why they should not be held in contempt. Simultaneously, State Fair moved before the magistrate to quash the warrant, asserting, as it had earlier before this court, that the Commission's jurisdiction to conduct inspections does not extend to products such as the aerial tramway or entities such as State Fair. In the interest of judicial economy, both motions were transferred to this court by the magistrate.[1] While these activities were taking place before the magistrate, a separate action was commenced by plaintiff Steck and Stapf Attractions, Inc., the operator of the tramway under a license agreement with State Fair. S & S sought injunctive relief against the Commission's planned inspection insofar as it involved records and tramway components in the possession or under the control of S & S.[2] That action, initially assigned to Judge Barefoot Sanders, was transferred to this court and consolidated with the present action by order of Judge Sanders on November 6.[3]

The basic facts which underlie this action were set forth in the court's memorandum order of November 3. Since that time, the parties have supplemented the record by means of numerous affidavits and stipula-tions. Such additional and undisputed facts as are required for decision of this case will be set forth in the body of this opinion.

### I. Congressional Authorization of Applications for Warrants.

It is necessary at the outset to deal with the contention made by the State Fair that the Consumer Product Safety Act, even if arguably applicable, does not authorize issuance of an administrative inspection warrant.[4] In so arguing, State Fair relies heavily on the recent case of *Marshall v. Gibson's Products, Inc.*, 584 F.2d 668 (5th Cir. 1978). That case was an action brought by the Secretary of Labor seeking a mandatory injunction to require an employer to submit to a warrantless inspection under the Occupational Safety and Health Act ("OSHA"). The court of appeals held that 29 U.S.C. § 657(a)(1), which authorizes the Secretary to conduct inspections similar in nature to those which the Commission may conduct under 15 U.S.C. § 2065(a), provided no implicit basis of jurisdiction for the action, and that jurisdiction could not be sustained under the Secretary's regulations or under general statutory grants of jurisdiction.

In contrast with the relief sought in *Gibson's*, the relief sought by the Commission in this case takes the form of an administrative inspection warrant rather than a mandatory injunction. In the case of *Marshall v. Shellcast Corp.*, 592 F.2d 1369 (5th Cir. 1979), which extended the *Gibson's* holding to an action seeking an injunction

1. The action before the magistrate, styled *In re Establishment Inspection of State Fair of Texas and Steck and Stapf Attractions, Inc.*, Magistrate's Docket No. 3–79–132M, was consolidated with this action by order of this court dated November 8, 1979, and without objection of the parties.

2. The claim with respect to records was dropped after it was determined that no records were sought from S & S by the Commission.

3. The S & S action was styled *Steck & Stapf Attractions, Inc. v. United States Consumer Product Safety Commission*, Civil Action No. CA–3–79–1388–H.

4. This argument was first made at a very late stage of the proceedings and notwithstanding the fact that State Fair had expressly conceded such authority at the hearing held by the court on November 6. While the court would ordinarily not consider arguments raised under such circumstances, the doctrine that lack of subject matter jurisdiction may not be waived by the parties, and must be noted by the court *sua sponte* if necessary, is sufficiently implicated that the argument will be addressed. *See Marshall v. Gibson's Products, Inc.*, 584 F.2d 668, 672 (5th Cir. 1978).

requiring compliance with an administrative inspection warrant, the court expressly noted that "the provision or preclusion of jurisdiction for the issuance of search warrants is quite a different matter from the provision or preclusion of jurisdiction for an injunction." 592 F.2d at 1371 n.3. The court cited Congressional concern over the constitutionality of OSHA, together with the Supreme Court's decision in *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (nonconsensual warrantless searches under OSHA are unconstitutional), as "argu[ing] strongly for the position that federal courts do have jurisdiction to issue OSHA search warrants." 592 F.2d at 1370–71 n.3. Indeed, this court has expressly so held with respect to OSHA warrants. *Marshall v. Huffhines Steel Co.,* 478 F.Supp. 986 (N.D.Tex., 1979) (order denying motion to dismiss). It must be presumed that Congress possessed similar concerns over the constitutionality of the Consumer Product Safety Act, and hence that Act must be regarded as an implied basis of jurisdiction for actions seeking warrants under the Act. A contrary holding would render 15 U.S.C. § 2065 a nullity, since the Commission would be unable to obtain a warrant and yet could not inspect without a warrant by virtue of *Barlow's.*

A further basis for the decision in *Gibson's* was provided by the language of OSHA itself. Although several sections of OSHA gave the district courts jurisdiction in specific instances, that Act contained no grant of general authority to the Secretary of Labor to bring suit under its provisions. While the Solicitor of Labor was authorized to appear on behalf of the Secretary "in

any civil litigation brought under [OSHA]," *see* 29 U.S.C. § 663, the court held that this provision did not expand the category of suits which the Secretary could bring. It accordingly failed to find jurisdiction of the suit under 28 U.S.C. § 1345 as a civil action commenced by an officer or agency of the United States "expressly authorized to sue by Act of Congress." 584 F.2d at 676–77.

The provisions of OSHA, authorizing suit only in specific instances, stand in stark contrast to those of the Consumer Product Safety Act. 15 U.S.C. § 2076(b)(7) authorizes the Commission "to initiate, prosecute, defend, or appeal . . ., through its own legal representative and in the name of the Commission, *any civil action* . . . for the purpose of enforcing the laws subject to its jurisdiction," if the Attorney General does not assume responsibility for conducting the action in the Commission's behalf (emphasis supplied).[5] Hence the Commission fits squarely within the language of 28 U.S.C. § 1345 as an agency "expressly authorized" to bring suit.[6] Accordingly, State Fair's arguments concerning this court's lack of jurisdiction to issue a warrant must be rejected.

## II. Scope of This Court's Review.

■ The Commission argues at some length that the scope of this court's review of its decision to investigate a particular product or entity must necessarily be limited. In so arguing, it analogizes this proceeding to an action for enforcement of an administrative subpoena *duces tecum,* and points to that line of cases, discussed more fully below, which holds that a district

5. The statute provides for 45 days' written notice to the Attorney General before the Commission may proceed through its own legal representative. While no such notice has been given, the Commission has been represented throughout these proceedings by attorneys from the Department of Justice as well as by its own attorneys, thus satisfying the statutory requirement.

6. In an apparent attempt to come within the provision of § 1345 authorizing suit by the United States, some pleadings on behalf of the Commission have purportedly been filed by the United States. In light of its holding on the

jurisdictional questions discussed above, the court has treated these pleadings as having been filed by the Commission. The United States is not a party to this action, and its inclusion as a party would raise substantial questions of its standing. *See Gibson's, supra,* at 676 n.10; *In re Debs,* 158 U.S. 564 (1895); *United States v. Solomon,* 563 F.2d 1121 (4th Cir. 1977); Note, *Nonstatutory Executive Authority to Bring Suit,* 85 Harv.L.Rev. 1566, 1571 (1972). *Such questions are avoided in the case of an action brought by the Commission pursuant to its statutory authority.*

court may not inquire into an agency's jurisdiction so long as the material sought by subpoena is not "plainly incompetent or irrelevant to any lawful purpose" of an agency. *See Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424 (1943). This doctrine, while not strictly one of exhaustion of administrative remedies, stems from concerns over the effects of premature judicial interference with administrative processes similar to those which have prompted the exhaustion doctrine. In the exhaustion area, the law is clear that a litigant may bypass available administrative procedures only where there is a readily observable usurpation of power not granted to the agency by Congress. *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). *American General Insurance Co. v. F.T.C.,* 496 F.2d 197, 200 (5th Cir. 1974); *United States v. Feaster,* 410 F.2d 1354, 1366–68 (5th Cir.), *cert. denied,* 396 U.S. 962, 90 S.Ct. 427, 24 L.Ed.2d 426 (1969).

In *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), the Court was faced with the question of the scope of review of the jurisdiction of the Wage and Hour Administration in enforcement by a district court of the Administrator's subpoena *duces tecum.* In holding that the district court must enforce the subpoena without requiring the Administrator to demonstrate his jurisdiction, the Court stated:

> Congress has authorized the Administrator, rather than the district courts in the first instance, to determine the question of coverage in the preliminary investigation of possibly existing violations; in doing so to exercise his subpoena power for securing evidence upon that question, by seeking the production of petitioners' relevant books, records and papers; and, in case of refusal to obey his subpoena, issued according to the statute's authorization, to have the aid of the district court in enforcing it.

327 U.S. at 214, 66 S.Ct. at 508. *Accord, United States v. Morton Salt Co.,* 338 U.S. 632, 641–43, 70 S.Ct. 357, 94 L.Ed. 401 (1950); *Endicott Johnson Corp. v. Perkins,*

*supra,* 317 U.S. at 509, 63 S.Ct. 339; *F.T.C. v. Texaco, Inc.,* 180 U.S.App.D.C. 390, 399–401, 555 F.2d 862, 871–73 (D.C.Cir.), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977); *F.T.C. v. Gibson,* 460 F.2d 605, 608 (5th Cir. 1972); *Genuine Parts Co. v. F.T.C.,* 445 F.2d 1382, 1391 (5th Cir. 1971). In these cases, the courts have reasoned that the minimal expense and disruption suffered by a private party as a result of an agency investigation is generally insufficient to warrant cutting off the agency's inquiry, often before it has obtained sufficient facts to clearly demonstrate its jurisdiction. *See Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938).

All these cases arose in the context of district court enforcement of administrative subpoenas. While the scope of review of administrative search warrants rests upon the same balancing of the conflicting interests of agencies and private parties as in the case of administrative subpoenas, the differing degrees of hardship suffered by the party under investigation may warrant a different resolution of the issue. The Court in the *Oklahoma Press* case expressly recognized that a judicial order providing for enforcement of a subpoena *duces tecum* did not present the same Fourth Amendment considerations as would an actual search and seizure. *Oklahoma Press, supra,* 327 U.S. at 195–96, 202–08, 66 S.Ct. 494. An administrative subpoena, requiring production of documents for examination and copying and witnesses for examination under oath, constitutes a far less serious disruption of an organization's day-to-day activities than does the physical entry of agency employees onto the organization's business premises for inspection purposes. *Cf. See v. City of Seattle,* 387 U.S. 541, 545, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) (illogical to require greater safeguards for subpoenas than for warrants). At the same time, the disruption inherent in the execution of an administrative inspection warrant formed the basis for the Supreme Court's recent decision in *Barlow's, supra,* and so it is logical to turn to that case for aid in applying this balancing test.

In describing the functions served by an administrative inspection warrant, Justice White wrote for the Court that

[t]he authority to make warrantless searches devolves almost unbridled discretion upon executive and administrative offices, particularly those in the field, as to when to search and whom to search. A warrant, by contrast, would provide assurances from a neutral officer that the inspection is reasonable under the Constitution, *is authorized by statute,* and is pursuant to an administrative plan containing specific neutral criteria.

436 U.S. at 323, 98 S.Ct. at 1825–1826 (emphasis supplied). Justice Stevens in dissent echoed these three functions (although he argued that the purposes of administrative warrants were otherwise met), stating that one purpose of the inspection warrant is "to inform the employer that the inspection is authorized by the statute." 436 U.S. at 332, 98 S.Ct. at 1830. Thus it would appear that one element of the "administrative probable cause" which must be found by the magistrate is statutory authority for the inspection.

■ This view is supported by the analysis in *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), upon which the decision in *Barlow's* was in large measure based. In *Camara,* the government asserted that the function of a magistrate in issuing an administrative warrant must necessarily be ministerial unless he is willing to engage in a comprehensive review of the exercise of agency discretion which led to the request for the warrant. In responding to this argument, the Court noted that the magistrate's function involved review of a number of matters, including the authority of the inspection, the lawful limits of his power to search, and whether nonconsensual entry onto private premises was required in order to enforce the statute, all of which could be determined without reassessment of the discretion exercised by the agency. The teaching of *Camara* and *Barlow's* is that one of the purposes served by the administrative warrant requirement is to assure the landowner that a neutral official is satisfied that the

agency is authorized by law to conduct the search. Thus it follows that a magistrate must examine an agency's statutory jurisdiction as a prerequisite to authorization of the more intrusive investigatory remedy of administrative search.

This holding in no way thwarts the Commission in its preliminary efforts to obtain sufficient facts on which to base an informed assessment of its own jurisdiction. The Commission has a broad spectrum of investigatory tools at its disposal. In addition to inspections pursuant to 15 U.S.C. § 2065 and 16 C.F.R. § 1182 [44 Fed.Reg. 31,929–30 (1979)], the Commission may issue subpoenas *duces tecum,* 15 U.S.C. § 2076(b)(3); 16 C.F.R. §§ 1118.3(a)(1) and 1118.4; conduct investigational hearings, 15 U.S.C. § 2076(a); 16 C.F.R. §§ 1118.3(a)(2) and 1118.5; take depositions, 15 U.S.C. § 2076(b)(4); 16 C.F.R. §§ 1118.3(a)(3) and 1118.6; and issue general or special orders (analogous to interrogatories under Fed.R. Civ.P. 33), 15 U.S.C. § 2076(b)(1); 16 C.F.R. §§ 1118.3(a)(4) and 1118.8. The court today holds only that the Commission must be able to demonstrate its own jurisdiction before seeking the aid of the court in making use of the most disruptive of the arrows in this investigatory quiver. The Commission having chosen to proceed by administrative search warrant without first conducting an investigation by other means, it becomes this court's task to determine whether the limited record before it demonstrates that the Commission has jurisdiction. This in turn depends on whether State Fair's aerial tramway is a "consumer product" under the Act, and on whether inspection of the tramway is authorized by 15 U.S.C. § 2065. To each of these questions the court now turns.

### III. The Aerial Tramway's Status as a "Consumer Product".

■ In order for § 16(a)(1) of the Consumer Product Safety Act, 15 U.S.C. § 2065(a)(1), to authorize an inspection of the aerial tramway at the State Fair, the ride must be a consumer product within the meaning of § 3(a)(1) of the Act, 15 U.S.C. § 2052(a)(1). The issue of whether an

amusement park ride is a consumer product within the meaning of this Act is one of first impression in this circuit. Those courts which have addressed this issue offer different answers. In *Consumer Product Safety Commission v. Chance Manufacturing Co.*, 441 F.Supp. 228 (D.D.C.1977), the court held that the "Zipper," a ride consisting primarily of a boom which rotates in a 360 degree arc, is a consumer product. In *Walt Disney Productions v. United States Consumer Product Safety Commission*, No. 79–0170–LEW (Px) (C.D.Cal., April 17, 1979), *appeal docketed*, No. 79–3435 (9th Cir. 1979), the court found that the sky rides at Disneyland and Disney World are not consumer products.

Through consideration of the individual elements in the statutory definition of "consumer product," this court concludes that the term covers the aerial tramway here involved. The Act declares that:

> The term "consumer product" means any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around permanent or temporary household or residence, a school, in recreation, or otherwise; but such term does not include—
>
> (A) any article which is not customarily produced or distributed for sale to, or use or consumption by, or enjoyment of, a consumer . . . .

15 U.S.C. § 2052(a)(1). The Act goes on to provide specific exemptions for a variety of products unrelated to this sort of amusement park ride. Redefined, the question with which we are faced is whether this ride is an "article . . . produced or distributed for the personal use . . . or enjoyment of a consumer . . . in recreation" that does not fall within the exception quoted above.

■ The tramway is an "article," being "an object produced or distributed as a distinct article of commerce, rather than any physical entity that might exist only at an intermediate stage of production." *Consumer Product Safety Commission v. Anaconda Co.*, 193 U.S.App.D.C. 160, 165, 593 F.2d 1314, 1319 (D.C.Cir. 1979). That the tramway is large ought not concern us. Were bulk to be considered in determining the boundaries of the term "article," Congress would not have needed to expressly exempt aircraft from designation as a consumer product. *See* 15 U.S.C. § 2052(a)(1)(H).

The ride was clearly produced "for the personal use . . . or enjoyment" of consumers "in recreation," as those terms are normally understood. We can dispose of a variety of grounds for challenging this assertion. Given the nature of the site of the tramway, and the expense, speed, and other features of the ride itself, an argument that the ride was not intended for the enjoyment of recreation-minded consumers fails.

■ A second argument is that only household products can properly be considered consumer products. It would be unnatural to read the phrase "in recreation" as modifying the preceding phrase "in or around a . . . household or residence, a school, . . . ." Because "or" is used in that segment of the definition of consumer product, each of the nouns in that segment serves as an independent jurisdictional base. *Chance, supra* at 233; *ASG Industries, Inc. v. Consumer Product Safety Commission*, 193 U.S.App.D.C. 169, 174 n.16, 593 F.2d 1323, 1328 n.16 (D.C.Cir.), *cert. denied*, —— U.S. ——, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979). It follows that a consumer product is not necessarily a household product.

■ Third, one might assert that the adjective "personal" incorporates the concept of individual dominion and control with respect to transfers to consumers not involving a sale. But courts simply have not held that the term "personal" imports a control requirement. *See Consumer Product Safety Commission v. Chance Manufacturing Co., supra*, at 233; *Kaiser Aluminum & Chemical Corp. v. United States Consumer*

*Product Safety Commission*, 574 F.2d 178, 180 (3rd Cir.), *cert. denied*, 439 U.S. 881, 99 S.Ct. 218, 58 L.Ed.2d 193 (1978). In *Chance*, the court held that:

> [t]hough the riders of the Zipper do not control it, own it, or otherwise possess it, their occupancy of its cars and concomitant exposure to whatever dangers it may present are sufficient to satisfy the "personal use, consumption or enjoyment" clause.

*Id.* In addition, the court asserted that nowhere does the legislative history of the Act suggest that "Congress intended to import a 'control' requirement into the definition of the term 'consumer product.'" *Id.*

■ Fourth, State Fair argues that because the tramway is not being sold to consumers it cannot be considered a consumer product. This argument also fails. Pointedly, the requirement that the product customarily be "produced or distributed for sale" was eliminated prior to enactment. The amended definition only required that the article be produced or distributed for a consumer's use. *See* Note, *The Consumer Product Safety Commission: An Agency Manual*, 43 Geo.Wash.L.Rev. 1077, 1082–83 (1975). Indeed, the House Report asserted that:

> . . . products which are manufactured for lease and products distributed without charge . . . are included within the definition and would be subject to regulation . . . .. Also, products which are primarily or exclusively sold to industrial or institutional buyers would be included within the definition of consumer product so long as they were produced or distributed for the *use* of consumers.

H.R.Rep.No. 1153, 92d Cong., 2d Sess. 27 (1972).

■ Finally, the ride is not a product which is "not customarily produced or distributed for sale to, or use or consumption by, or enjoyment of a consumer." This exclusion was intended to exclude industrial products, on the premise that industrial purchasers can better protect themselves and are subject to regulation under the Occupational Safety and Health Act of 1970. *Kaiser Aluminum, supra*, at 180–81. It can hardly be maintained that aerial tramways are produced for any reason but for the use or enjoyment of a consumer: the ride is simply not an industrial product. Moreover, this ride, though not purchased by consumers, exposes them to possible danger and is not regulated under OSHA.

■ The only forceful argument that the ride cannot be considered a "consumer product" lies outside the definition provided by the Act. As the court in *Disney, supra*, pointed out, § 2066(b) authorizes the Commission to obtain "free samples" of any consumer product offered for import into the United States and § 2076(f) authorizes the Commission, in the exercise of its functions, to purchase at cost any consumer product it needs. Because of the cost of aerial tramways, it seems unrealistic to speak of acquiring them free or at cost. But were the ability to be sampled required of a consumer product, there would have been no need to expressly exempt aircraft from the Act's coverage. And while acquiring samples of an entire tramway may not be feasible, the Commission may well acquire various components thereof. Given that the tramway fits comfortably within that language in the Act expressly set out as the definition of consumer product, a peripheral appearance of inconsistency ought not affect the outcome. Any inconsistency is peripheral at best because there is nothing in the idea that the Commission is authorized to obtain samples that leads one to the conclusion that where it is impractical to do so, no right of inspection was intended. The Commission is authorized, not required, to sample.

## IV. The Commission's Inspection Authority.

■ The foregoing analysis demonstrates that State Fair's aerial tramway is encompassed within the expansive definition of "consumer product" contained in 15 U.S.C. § 2052(a)(1). The answer to this question does not resolve the present dispute, however, but merely brings a subsidi-

ary question into focus. Once it is determined by reference to § 2052(a)(1) that a product is a "consumer product" under the Act, it is necessary to turn to § 2065 and related sections to determine the entities in whose hands the product is subject to inspection and the locations in which the product may be inspected. We find that the Commission has not yet provided this court with enough information to demonstrate its authority to conduct this investigation.

15 U.S.C. § 2065(a) authorizes the Commission "to enter, at reasonable times, any factory, warehouse, or establishment in which consumer products are manufactured or held, in connection with distribution in commerce" and "to inspect . . . those areas of such factory, warehouse, or establishment where such products are manufactured, held, or transported and which may relate to the safety of such product." To fully interpret this language, it is necessary to make use of the various definitions contained in 15 U.S.C. § 2052(a).

The Commission first argues that State Fair and S & S have manufactured the tramway. 15 U.S.C. § 2052(a)(8) defines "manufactured" as "to manufacture, produce, or assemble." The Commission points to the action of State Fair in supplying the earth fill to raise the surface of the land for use as the north terminal of the tramway as an act of manufacture, and argues that State Fair and S & S "assemble" the tramway whenever they perform routine maintenance on the tramway, such as replacing worn components or repairing or replacing malfunctioning parts.

The weakness of the Commission's argument is clear. Congress cannot have intended that any person who assists in the installation of a consumer product or performs routine repairs or maintenance on such a product has thereby "manufactured" the product. Such an argument would mean that a television repairman replacing

tubes in a set, an electrician replacing a worn cord on a lamp, or even a parent replacing the chain on his child's bicycle, is "manufacturing" the consumer product on which he works. Congress cannot have intended such an anomalous result.

A more reasonable interpretation of Congress' purpose in defining "manufactured" to include "to assemble" is that Congress intended to embrace the situation where a factory receives component parts manufactured elsewhere and constructs ("assembles") consumer products on its premises from these component parts. For example, a factory assembling television sets from component parts manufactured elsewhere is itself a manufacturer within the meaning of the Act. Common sense indicates that this is the situation that Congress had in mind when it defined "manufactured" to include "to assemble," and not the situation in which routine maintenance and repairs are performed on an individual product, as is the case with the tramway at State Fair. Similarly, assistance in the installation of a single product does not render the person providing such assistance a manufacturer under the Act. We are not saying that the Commission will not be able to show that State Fair did not "assemble" the tramway, but only that the Commission has not yet done so.

The Commission next argues that State Fair is an "establishment in which consumer products are . . . held, in connection with distribution in commerce." *See* 15 U.S.C. § 2065(a)(1)(A). "Distribution in commerce" is defined by 15 U.S.C. § 2052(a)(11) as meaning "to sell in commerce, to introduce or deliver for introduction into commerce, or to hold for sale or distribution after introduction into commerce." The Commission relies principally on the third prong of this definition, arguing that the tramway is "held for sale or distribution after introduction into commerce."[7] With respect to the argument

7. Since the tramway was manufactured in Switzerland and imported into the United States several years before it came into the hands of State Fair, it cannot seriously be con-

tended that State Fair is holding the tramway itself for introduction into commerce or for delivery for introduction into commerce. The concept of introduction into commerce or deliv-

that the tramway is held for sale by State Fair or S & S, however, it must be remembered that the consumer product in this case is the tramway itself and not the licenses (tickets) which allow passengers to be transported on the tramway. The latter are not "articles" within the meaning of 15 U.S.C. § 2052(a)(1), since they constitute no more than "an abstract right to occupy an amusement device." *See Albert v. State*, 80 Misc.2d 105, 362 N.Y.S.2d 341, 344 (Ct.Cl. 1974), *aff'd* 51 A.D.2d 611, 378 N.Y.S.2d 125 (1976). It is undisputed that State Fair has no intention of selling the physical equipment which comprises the tramway to anyone.

The question thus becomes whether or not State Fair and S & S are holding the tramway for distribution after introduction into commerce within the meaning of § 2052(a)(11). Neither the Act nor its legislative history provide substantial guidance as to the meaning of the phrase "to hold for distribution after introduction into commerce." A mechanical reapplication of the definition of "distribution in commerce" in § 2052(a)(11) would lead to the circular result that the phrase means "to hold for sale in commerce, to hold for introduction or delivery for introduction into commerce, or to hold for sale or distribution after introduction into commerce." Hence it is necessary to give a broader definition to the term distribution than is contained in that section. The concept of distribution, as that term is used in a generic sense, does generally involve a transfer of possession or control over an object. One does not ordinarily speak of a product being "distribut-

ed" when it is merely made available for public use without such a transfer. In this case, neither possession nor control of the tramway ever passes to consumers. A passenger on a Skyride never controls the Skyride; instead, he or she merely sits passively in the gondola of the tramway.[8] Nor can the passenger be said to possess the ride in any way, any more than a patron in a theater can be said to possess the seat from which he watches the performance.[9] Because neither possession nor control of the tramway passes to the consumer, State Fair and S & S do not distribute the ride, and cannot be said to hold the ride for distribution after introduction into commerce.

If Congress had intended the mere leasing or licensing of a product to constitute distribution in commerce, Congress could have easily done so as explicitly as in its definition of "consumer product." While Congress, during the legislative process, specifically altered the definition of "consumer product" to include products produced for use by consumers (and hence including those products which are leased or provided without charge), Note, *supra*, 43 Geo. Wash.L.Rev. at 1082–83; H.R.Rep.No. 1153, 92d Cong., 2d Sess. 27 (1972); H.R.Rep.No. 1593, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 4596, 4629, it did not add corresponding language to the "manufactured or held, in connection with distribution in commerce" language of § 2065(a)(1) or the definitions of "distributor" or "distribution in commerce" in §§ 2052(a)(5) and 2052(a)(11), respectively. This court ought not broaden the inspection

---

ery for introduction into commerce denotes the first transportation of a product in interstate commerce or the delivery of a product for its first transportation in interstate commerce. These functions were accomplished at the time the tramway was imported into the United States.

**8.** While the concept of consumer control is only marginally relevant to the definition of a "consumer product," *Chance, supra*, at 233, it is intimately related to the ordinary definition of "distribution." Thus the statement of the court in *Chance* that "the legislative history of the Act nowhere suggests that Congress intended to import a 'control' requirement into

the definition of the term 'consumer product' " is fully consistent with this analysis. There the court was considering the definition of consumer product; here the court must analyze the concept of distribution.

**9.** To carry this analogy even further, can an observer in a courtroom be said to possess the seat from which he observes the proceedings? Is it possible that Congress could have intended that the courtroom seat—which occasionally may be repaired by those who maintain the court facility—be considered as "manufactured" by the court and "held for distribution in commerce" by the courts?

authority beyond that palpably signaled by Congress.

■ A similar analysis must be undertaken with respect to the language of 15 U.S.C. § 2065(a)(2), which permits *inspection* of consumer products within the areas the Commission may *enter* pursuant to § 2065(a)(1). The Commission argues that the former section, which speaks of areas where products are held, without the constraints of a "distribution in commerce" requirement, provides an independent and more expansive grant of authority to the Commission. To read § 2065(a)(2) in such a manner, however, would render § 2065(a)(1) superfluous. Section 2065(a)(2), which speaks of "*such* factory, warehouse, or establishment" (emphasis supplied) must necessarily be held to relate back to § 2065(a)(1) for a determination of which factories, warehouses, and establishments are encompassed within the provisions of the second subsection. Thus the "in connection with distribution in commerce" requirement, while not appearing directly in § 2065(a)(2), is engrafted onto that section through its relationship with § 2065(a)(1).

The conditions under which the Commission may inspect books and records relating to consumer products, as distinguished from the products themselves, are set forth in § 2065(b). Under that section, the Commission is entitled to inspection if State Fair is a "manufacturer, private labeler, or distributor" of a consumer product. "Manufacturer" is defined by § 2052(a)(4) to mean one who manufacturers or imports. "Private labeler" is defined as "an owner of a brand or trademark on the label of a consumer product which bears a label." 15 U.S.C. § 2052(a)(7)(A). Finally, "distributor" is defined by § 2052(a)(5) as "a person to whom a consumer product is delivered or sold for purposes of distribution in commerce."

The arguments that State Fair has manufactured the tramway, or is distributing it in commerce, have already been discussed at length and rejected insofar as the record before this court permits. That record also indicates that State Fair did not import the tramway, and instead purchased it from a domestic owner several years after its importation. Thus the argument turns on whether State Fair is a "private labeler" under the Act.

The Commission argues that State Fair is the owner of the trademarks "Skyride" and "Swiss Skyride," based on a 1971 agreement between State Fair and the previous owner of the tramway which purports to assign those trademarks to State Fair as part of State Fair's purchase of the ride itself. We find that the Commission has yet to provide sufficient evidence to show that State Fair ought to be considered a "private labeler." Even if these terms are regarded as brands or trademarks owned by State Fair, the legislative history of the Act raises questions concerning whether State Fair is encompassed within the term "private labeler": "a 'private labeler' is defined to mean an owner of a brand or trademark which is placed on a consumer product *in lieu of* that of the manufacturer's [sic]." H.R.Rep.No. 1153, 92d Cong., 2d Sess. 28 (1972) (emphasis supplied). The House Report further indicates that the focus of the private labeler definition involves "a person [who] holds himself out as manufacturing a product and standing behind the product's quality or performance." *Id.* Little or no evidence of the nature of the labeling on the aerial tramway has been offered and the court is not able to determine State Fair's status as a "private labeler" on the record before it.

### V. SUMMARY.

Two vital considerations are at stake in disputes involving administrative investigations. On the one hand, the public interest might be served by the efficiencies of unfettered probes into the lives of subject individuals or organizations. On the other hand, the multitudinous facets of the right to be let alone are not merely classroom ideals but are core constitutional concepts.

These considerations manifest themselves in the applicable law. For example, while the legislative history clearly demonstrates that Congress intended as broad as possible a definition of consumer products within

the scope of the Commission's jurisdiction, Congress was careful enough to provide that those products which meet the Act's definition are not subject to inspection regardless of their location or ownership. Hence we find the tramway is indeed a "consumer product," but we also find that the Commission has not yet shown it can inspect the ride in the hands of State Fair and S & S. The dangers of excessive government interference are minimized at little loss of efficiency through the Commission's use of the more limited modes of investigation for which Congress has expressly provided. In this fashion, the Commission can generate the information which may make it possible for a court to be sure that the broader search made possible by a warrant is permissible.

An administrative agency vested by Congress with investigative and inquisitorial powers must be allowed to first determine if a product or firm is within its congressional charge except in those cases, hopefully few in number, when jurisdiction is obviously absent. *Leedom v. Kyne, supra.* That principle of administrative law is long established and is here again affirmed. It will allow the Commission to proceed with an extensive array of investigative devices including, for example, in the case of administrative subpoenas, the enforcement power of the courts, all without having the investigative process nipped in its infancy by jurisdictional hairsplitting. To apply this deferential standard to the issuance of warrants would further limit the already limited interpositional role of the magistrate and denigrate a firm's right of privacy.

To be sure, allowing an administrative agency to first determine its own jurisdiction may impose expense upon those subject to investigation and inconvenience them— all without a showing that "jurisdiction" is present. The corresponding benefits of this jurisdiction-to-determine-jurisdiction, on the other hand, include the avoidance of slowing the inquisitorial process and other by-product values such as agency maturation and self-discipline as well as extra-judicial dispute resolution.

In summary, the Commission's jurisdiction here is not so plainly absent that it cannot proceed with all its investigative tools except entry and seizure for which an administrative warrant is required. It adds little to argue that these rides ought to be investigated in the public interest. Of course that is true, but that assertion hardly answers the question of who ought to investigate.

Having dealt at length with the intricacies of this case, one final general observation is in order. Government has long required a hunter to produce his license on request when found in hunting fields. Poaching of all kinds has always been regarded as unacceptable. With the individual's right to privacy and the accountability of governmental agencies on the list of endangered species, it would seem anomalous not to require a federal agency to produce its license from Congress when it hunts. This opinion does no more than that.

Three consolidated actions are now pending before the court. In No. 3–79–132M, the motion to quash the *ex parte* administrative inspection warrant is GRANTED without prejudice to future application for a warrant should the Commission's investigation, otherwise conducted, develop facts sufficient to support a finding that the Consumer Safety Product Act is applicable both to the product and to the firm to be inspected. The motion for an order requiring State Fair and S & S to show cause why they should not be held in contempt is DENIED. In Nos. CA–3–79–1367–G and CA–3–79–1388–G, the remaining prayers for injunctive relief are DENIED. The respective plaintiffs are granted and denied declaratory relief in conformity with the foregoing opinion. Judgments will be entered accordingly.