**1314**

CONSUMER PRODUCT SAFETY
COMMISSION, Appellant,

v.

The ANACONDA COMPANY, a wholly
owned subsidiary of Atlantic Richfield
Company et al.

CONSUMER PRODUCT SAFETY
COMMISSION

v.

The ANACONDA COMPANY et
al., Appellants.

Nos. 78–1054, 78–1070.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 5, 1978.

Decided Jan. 31, 1979.

As Amended Feb. 6, 1979.

Rehearing Denied April 10, 1979.

Nancy L. Buc, New York City, with whom Philip J. Harter, Edmund E. Harvey, Christopher H. Buckley, Jr., Fred F. Fielding, James Skelly Wright, Jr., Christopher Sanger, Eldon H. Crowell, Patrick W. Lee, Washington, D. C., Donald Letizia, Fort Wayne, Ind., Peter Barnes, Steven J. Agresta, Henry P. Sailer, Robert Matthew Sussman, Donald J. Mulvihill, R. Bruce Dickson, James L. Kaler, Sherwood B. Smith, Jr., F. Anthony Maio, Michael D. Fischer, John F. Graybeal, and Michael Hausfeld, Washington, D. C., were on brief for appellants in No. 78–1070, and appellee in No. 78–1054 The Anaconda Co., et al.

William N. Letson, with whom Gearold L. Knowles, Washington, D. C., was on brief, for appellant in No. 78–1070, appellees in No. 78–1054 Coleman Cable and Wire Co.

Ronald J. Greene, Washington, D. C., with whom Edward Tynes Hand, Washington, D. C., was on briefs, for appellee in No. 78–1054 and appellants in No. 78–1070, The Kaiser Aluminum and Chemical Corp., et al.

Norman C. Barnett, Sol., Consumer Product Safety Commission, Washington, D. C., with whom Jerome B. Morris, Atty., Consumer Product Safety Commission, Washington, D. C., was on the brief, for appellees in No. 78–1070 and appellant in No. 78–1054.

Douglas L. Parker and Charles E. Hill, Washington, D. C., were on the brief, for Amicus Curiae in No. 78–1070.

Paul G. Wallach, New York City, entered an appearance for appellant in No. 78–1070, Triangle PWC, Inc.

Also Jonathan Z. Cannon, Washington, D. C., entered an appearance for appellant in No. 78–1070, Bryant Electric Co. etc.

Also Paul M. Vincent, Washington, D. C., entered an appearance for appellant in No. 78–1070, Reynolds Metals Co.

Also Ridgway M. Hall, Jr., Washington, D. C., entered an appearance for appellant in No. 78–1070, Essex Group, Inc.

Also Herbert Cohen, Arlington, Va., entered an appearance for appellant in No. 78–1070 Southwire Co.

Also Alan S. Anderson, Washington, D. C., entered an appearance for appellant in No. 78–1070, Eagle Electric Manufacturing Co., Inc.

Also Robert M. Sussman, Washington, D. C., entered an appearance for appellee in No. 78–1070, General Electric Wiring Device Business Department.

Before BAZELON, LEVENTHAL and ROBB, Circuit Judges.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

Since the mid-1960's many of the central wiring systems that have been installed in residential structures have incorporated

aluminum wiring as the primary electrical conductor.[1] Until the early 1970's, these "aluminum branch circuit wiring systems" borrowed the technology developed for use in similar copper wiring systems with respect to the design and installation of the electrical outlets, switches, and other devices that comprise the finished product. Accumulating evidence that these wiring systems might present a fire hazard prompted the industry to develop new performance standards for aluminum wiring and for the devices used with aluminum conductors.[2] Prior to this development, "old technology" aluminum branch circuit wiring systems were installed in at least 1.5 million residences throughout the United States.[3]

The Consumer Product Safety Commission ("CPSC" or the "Commission"), an agency established pursuant to the Consumer Product Safety Act of 1972 ("CPSA" or the "Act"),[4] has exercised certain of its investigative, rulemaking, and adjudicatory powers in an effort to isolate the causes of, and to alleviate the hazard associated with, old technology aluminum wiring systems. These interlocutory appeals arise from an action filed by CPSC in the United States District Court for the District of Columbia pursuant to CPSA § 12. That section authorizes the Commission, upon discovery that a consumer product "presents imminent and unreasonable risk of death, serious personal illness, or severe personal injury," to seek a declaratory judgment that the product is "an imminently hazardous consumer product," and to obtain such affirmative relief "as may be necessary to protect the public."[5] The complaint named as defendants 26 corporations that between 1965 and 1973 manufactured and sold various components of the old technology aluminum wiring systems.[6] It sought temporary relief in the form of an order requiring widespread public notice of the hazard, the danger signals to look for, and precautionary measures to take, and sought as well an order requiring the permanent repair of residences wired with old technology aluminum wiring systems.[7] Defendants' motion to dismiss for lack of jurisdiction was denied, except in the case of Kaiser Aluminum & Chemical Corporation, which presented a special claim of collateral estoppel. Most of the defendants appear before us as appellants (No. 78–1070).[8] Kaiser is before us as appellee (No. 78–1054). For

1. Prior to the mid-1960's copper wiring was the choice of electrical contractors for use in residential wiring systems. Although aluminum is an excellent conductor of electricity, the metal found its principal use as a conductor in utility distribution lines, feeder lines, and aircraft wiring, uses for which its light weight and low cost gave it a competitive advantage over copper. As the cost of copper began to exceed significantly the cost of aluminum, aluminum wiring came into widespread use in residential branch circuit wiring systems. See Brief of CPSC at 12–13.

2. Underwriters Laboratory adopted a new standard in 1970 for aluminum wire and in 1972 for devices used with aluminum conductors. Id. at 15.

3. Id. at 6.

4. Pub.L. No. 92–573, 86 Stat. 1207 (1972) as amended by Pub.L. No. 94–284, 90 Stat. 503 (1976) (codified at 15 U.S.C. §§ 2051 et seq. (1976)).

5. CPSA § 12(a), (b)(1), 15 U.S.C. § 2061(a), (b)(1) (1976). "Such relief may include a mandatory order requiring the notification of such risk to purchasers of such product known to the defendant, public notice, the recall, the repair or the replacement of, or refund for, such product." CPSA § 12(b)(1).

6. The wire manufacturers were: Anaconda Co.; Cadillac Cable Corp.; Capital Wire & Cable Corp.; Cerro-Marmon Corp.; Coleman Cable & Wire Co., Inc.; Colonial Wire & Cable Co., Inc.; Columbia Cable and Electric Corp.; Essex Group, Inc.; Ettco Wire and Cable Corp.; General Cable Corp.; Kaiser Aluminum & Chemical Corp.; American Insulated Wire Corp.; Rhode Island Insulated Wire Co.; Reynolds Metals Co.; Southwire Co.; Triangle PWC, Inc. Complaint at 4–8.

The device manufacturers were: Bryant Electric Co.; Circle F. Indus., Inc.; Eagle Electric Manuf. Co., Inc.; General Electric Co.; Leviton Manuf. Co., Inc.; Pass & Seymour, Inc.; John I. Paulding, Inc.; Sierra Electric Co.; Slater Electric, Inc.; Square D. Co. Id.

7. Id. at 9–12.

8. Colonial Wire & Cable Co. and Cadillac Cable Corp. did not join in the appeal.

convenience, we shall refer collectively to the "defendants."

Section 12 is applicable only when the allegedly hazardous item is a "consumer product" as that term is defined by the Act.[9] In certain respects CPSC enjoys a broad jurisdiction over products that may cause injury to consumers. However, that jurisdiction is circumscribed by the Act's complex definition of "consumer product." Defendants contend that an aluminum branch circuit wiring system is not a "consumer product."

These wiring systems are manufactured from a number of products, some or all of which may qualify as "consumer products" within the applicable definition. But the alleged fire hazard is not caused by a defect in a component part; rather it arises from the improper design or installation of the wiring system as a whole. The Commission's view concerning the nature of the hazard is stated in the Notice of Proceeding for Development of Consumer Product Safety Standard, 40 Fed.Reg. 51218, 51219 (1975):

> In many cases, connections within "aluminum wire systems" become defective over a period of time, resulting in overheating or arcing at the point where the wire is connected to other elements of the system. These defects are caused by the presence in the joint of aluminum oxide and by the effects of vibration, creep,

9. CPSA § 3(a)(1), 15 U.S.C. § 2052(a)(1) provides:

(a) For purposes of this chapter:

(1) The term "consumer product" means any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise; but such term does not include—

(A) any article which is not customarily produced or distributed for sale to, or use or consumption by, or enjoyment of, a consumer,

(B) tobacco and tobacco products,

(C) motor vehicles or motor vehicle equipment (as defined by sections 102(3) and (4) of the National Traffic and Motor Vehicle Safety Act of 1966 [15 U.S.C. § 1391(3) and (4)]),

(D) pesticides (as defined by the Federal Insecticide, Fungicide, and Rodenticide Act [7 U.S.C. § 136 et seq.]),

(E) any article which, if sold by the manufacturer, producer, or importer, would be subject to the tax imposed by section 4181 of the Internal Revenue Code of 1954 [26 U.S.C. § 4181] (determined without regard to any exemptions from such tax provided by section 4182 or 4221, or any other provision of such Code), or any component of any such article,

(F) aircraft, aircraft engines, propellers, or appliances (as defined in section 101 of the Federal Aviation Act of 1958 [49 U.S.C. § 1301]),

(G) boats which could be subjected to safety regulation under the Federal Boat Safety Act of 1971 (46 U.S.C. § 1451 et seq.); vessels, and appurtenances to vessels (other than such boats), which could be subjected to safety regulation under title 52 of the Revised Statutes or other marine safety statutes administered by the department in which the Coast Guard is operating; and equipment (including associated equipment, as defined in section 3(8) of the Federal Boat Safety Act of 1971 [46 U.S.C. § 1452(8)]) to the extent that a risk of injury associated with the use of such equipment on boats or vessels could be eliminated or reduced by actions taken under any statute referred to in this subparagraph,

(H) drugs, devices, or cosmetics (as such terms are defined in sections 201(g), (h), and (i) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. § 321(g), (h), and (i)]), or

(I) food. The term "food," as used in this subparagraph means all "food", as defined in section 201(f) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. § 321(f)], including poultry and poultry products (as defined in sections 4(e) and (f) of the Poultry Products Inspection Act [21 U.S.C. § 453(e) and (f)], meat, meat food products (as defined in section 1(j) of the Federal Meat Inspection Act [21 U.S.C. § 601(j)]), and eggs and egg products [as defined in section 4 of the Egg Products Inspection Act (21 U.S.C. § 1033)].

Except for the regulation under this chapter or the Federal Hazardous Substances Act [15 U.S.C. § 1261 et seq.] of fireworks devices or any substances intended for use as a component of any such device, the Commission shall have no authority under the functions transferred pursuant to section 2079 of this title to regulate any product or article described in subparagraph (E) of this paragraph or described, without regard to quantity, in section 845(a)(5) of title 18. See sections 2079(d) and 2080 of this title, for other limitations on Commission's authority to regulate certain consumer products.

(Brackets in original.)

expansion and contraction, and transient electrical surges.

\* \* \* \* \* \*

The Commission notes further that poor workmanship in assembling aluminum wire connections appears to increase the likelihood of defective connections and component failure.

In 1973, shortly after its establishment, the Commission began to investigate various reports that fires resulting in injury and loss of life had been caused by failures in residential aluminum branch circuit wiring systems. In March and April of 1974 CPSC held public hearings on the subject. *See* 40 Fed.Reg. 51218 (1975). In November, 1975, the Commission instituted a rule-making proceeding for the development of one or more consumer product safety standards designed to reduce or eliminate the risks associated with aluminum branch circuit wiring systems. *Id.* Shortly thereafter, it directed the Commission staff to commence proceedings to seek relief for residences that already had the possibly hazardous aluminum wiring systems.

Pursuant to its responsibilities under CPSA § 5,[10] the Commission disseminated information alerting the public to the potential hazard posed by aluminum wiring systems and suggesting ways to alleviate the danger. In January of 1976, Kaiser Aluminum & Chemical Corporation brought suit in the United States District Court for the District of Delaware to enjoin the Commission from continuing to release allegedly inaccurate information concerning aluminum wiring. In March, District Judge Walter K. Stapleton held that CPSC was without jurisdiction to investigate aluminum wiring and to disseminate information with respect to the product because aluminum wiring was not a "consumer product" within the meaning of the Act. *Kaiser Aluminum & Chemical Corp. v. CPSC,* 428 F.Supp. 177 (D.Del.1976). This ruling was reversed by the Court of Appeals for the

Third Circuit in March, 1978. *Kaiser Aluminum & Chemical Corp. v. CPSC,* 574 F.2d 178 (3d Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 218, 58 L.Ed.2d 193 (1978).

In September, 1976, as a part of its ongoing investigation, CPSC issued subpoenas to various manufacturers of aluminum wiring and electrical devices that were used in old technology aluminum branch circuit wiring systems. In due course, it brought an action in the District Court for the District of Columbia to enforce the subpoenas against those companies that had refused to comply. In June, 1977, District Judge Thomas A. Flannery ruled that aluminum wiring systems were "consumer products" within the Act and generally granted enforcement of the subpoenas. However, the court gave collateral estoppel effect to the then extant ruling of the Delaware district court and denied the petition with respect to Kaiser. *United States v. Anaconda Co.,* 445 F.Supp. 486 (D.D.C.1977).[11]

In October, 1977, the Commission commenced the present action to obtain a declaration that old technology aluminum branch circuit wiring systems are "imminently hazardous consumer products," and to obtain such affirmative injunctive relief as might be required. In December, 1977, in response to defendants' motion to dismiss on jurisdictional grounds, District Judge Flannery issued an order reaffirming his June ruling that aluminum wiring systems were "consumer products." The memorandum opinion incorporated by reference the prior jurisdictional analysis. Again, the court granted Kaiser's motion to dismiss. Judge Flannery then certified the jurisdictional and collateral estoppel questions to this court pursuant to 28 U.S.C. § 1292(b) (1976). *CPSC v. Anaconda Co.,* 445 F.Supp. 498, 503 (D.D.C.1977). This court accepted the appeal.

### A. The Definition of "Consumer Product"

Various products have been involved in the Commission's investigation and rule-

---

**10.** 15 U.S.C. § 2054 (1976).

**11.** The appeal from the rulings in the enforcement proceeding has been held in abeyance by

this court pending the final disposition of the case presently before us. *United States v. Anaconda Co.,* No. 77–1628 (D.C.Cir. Jan. 27, 1978) (*sua sponte* order).

making activity with respect to aluminum wiring systems: the wiring system as a whole, the aluminum wiring, as well as the various connecting devices. In this case we need consider only the aluminum branch circuit wiring system as a whole. Two factors converge to narrow our focus: First, the alleged fire hazard arises from a deficiency in the design or installation of the wiring system as a whole rather than from a defect in one or more of the component parts. Second, the jurisdiction of the Commission to bring a section 12 action is narrowly limited by the Act; jurisdiction exists only if the product that presents an "imminent and unreasonable risk" qualifies as a "consumer product."

The Commission's authority to initiate an adjudicatory action under section 12 is more limited than its jurisdiction to engage in investigation or rulemaking. Under section 5(a)(1) of the Act, the Commission may investigate the causes of injuries that are "associated with" consumer products.[12] Similarly, section 7(a)(1) of the Act authorizes rulemaking "to prevent or reduce an unreasonable risk of injury associated with" a consumer product.[13] Thus if one or more of the components of an aluminum branch circuit wiring system qualifies as a consumer product, then the Commission would have jurisdiction to engage in investigation or rulemaking with respect to that product without regard to whether an aluminum branch circuit wiring system, as a distinct product, qualifies as a consumer product. *See Kaiser Aluminum & Chemical Corp. v. CPSC, supra.* In sum, if a component is a consumer product, the Commission has jurisdiction to investigate the entire system, since the hazard is "associated with" the

component, but the Commission does not have jurisdiction to seek an adjudicatory order as to the system as a whole unless that system itself qualifies as a consumer product.

We now turn to this all-important definition. The complete text of CPSA § 3(a)(1) appears in the margin.[14] Its core provision states:

> The term "consumer product" means any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise;

1. *The term "article."* A consumer product may be "any article, or component part thereof." From the context of the term "article," and particularly its juxtaposition with the phrase, "component part thereof," we discern that Congress contemplated an object produced or distributed as a distinct article of commerce, rather than any physical entity that might exist only at an intermediate stage of production.[15] The Senate Committee explained the reason for its insertion of the phrase "or component part thereof:" "The definition of 'consumer product' has been broadened to include 'a component' of the product, so that the Agency could regulate just a part of a product, if only such regulation is warranted."[16] Thus, a product may be a "consumer product" if it either is produced or dis-

---

12. 15 U.S.C. § 2054(a)(1) (1976).

13. 15 U.S.C. § 2056(a)(1) (1976).

14. *See* note 9 *supra.*

15. The Commission would have us adopt the following definition of the term: "An article is a particular object or substance, a material thing or a class of things, a tangible object. . . . The status of an item as an article turns on its identity as a concrete entity. . . ." CPSC Brief at 23. It is our view, however, that Congress intended the meaning of the term to be inferred from its context within the statute rather than for the term to assume all conceivable dictionary meanings. When the term is used in another part of the definitional section, it clearly refers to distinct articles of commerce. CPSA § 3(a)(1)(E), 15 U.S.C. § 2052(a)(1)(E) (1976).

16. Report of the Senate Committee on Labor and Public Welfare, S.Rep.No.92–835, 92d Cong., 2d Sess. 7 (1972), U.S.Code Cong. & Admin.News 1972, pp. 4573, 4579.

tributed as a distinct article of commerce (and fulfills the other definitional requirements), or is produced or distributed as a component part of such a distinct article.

■ *2. Alternative modes of distribution.* A consumer product must be produced or distributed either "(i) for sale to a consumer . . .," or "(ii) for the personal use, consumption or enjoyment of a consumer . . . ." What clause (i) contemplates is a direct sale of the product to the consumer. The legislative history reveals that clause (ii) was intended to complement clause (i) by reaching situations in which a consumer acquires the use of a product other than through a direct sale transaction, *e. g.,* through lease, promotional gift, or purchase by an institution for consumer use.[17] Together, clauses (i) and (ii) were designed to ensure that the definition of consumer product would encompass the various modes of distribution through which consumers acquire products and are exposed to the risks of injury associated with those products.[18]

■ *3. Housing is not a "consumer product."* Generally, an aluminum branch circuit wiring system is produced and distributed for sale to a consumer or for the use of a consumer as a component part of a residential structure. The language of the statute as well as the legislative history make clear that housing as such is not a "consumer product."[19] However, the Commission has taken the position that its jurisdiction extends to every component part of a dwelling including the central wiring and plumbing systems as well as the wall and flooring systems and their various building components. Such an extension of the statutory language would seem to ignore a contrary congressional intention and potentially raises significant problems of federalism in areas of building construction currently regulated extensively by local jurisdictions. Despite the best efforts of able counsel, the Commission had obvious difficulty at oral argument defending its interpretation in the face of the conceded congressional unwillingness to grant jurisdiction over housing, and the pervasive tone of

---

17. The Report of the Senate Commerce Committee on CPSA, S.Rep.No.92–749, 92d Cong., 2d Sess. (1972), elaborated on the somewhat ambiguous language of subpart (ii):

> To qualify as a "consumer product," therefore, the product must be one capable of production or distribution for sale to an individual but it is not necessary that the product actually be sold. For example, new razor blades distributed free of charge as a promotion would be considered "consumer products" under the terms of [the Act], or a product offered "free" but requiring other consideration would be a consumer product.

*Id.* at 12. The Report of the House Committee on Interstate and Foreign Commerce on CPSA, H.R.Rep.No.92–1153, 92d Cong., 2d Sess. (1972), concurred in this interpretation:

> Special attention should be paid to the use of the phrase: "produced or distributed for sale to * * * or for the use of * * * a consumer." It is not necessary that a product be actually sold to a consumer, but only that it be produced or distributed for his use. Thus products which are manufactured for lease and products distributed without charge (for promotional purposes or otherwise) are included within the definition of consumer product and would be subject to regulation under this bill. Also, products which are primarily or exclusively sold to industrial or institutional buy-

ers would be included within the definition of consumer product so long as they were produced or distributed for *use* of consumers. *Id.* at 27 (emphasis and ellipses in original).

18. *See, e. g., D. D. Bean & Sons Co. v. CPSC,* 574 F.2d 643 (1st Cir. 1978) (consumer product safety standard promulgated for paper matchbooks although 80–90% are sold for promotional purposes to be given away to consumers); *CPSC v. Chance Mfg. Co.,* 441 F.Supp. 228 (D.D.C.1977) (upholding CPSC jurisdiction over an amusement park ride although the ride was sold to an institutional buyer and not directly to consumers).

19. The phrasing in the definitional section requiring that a consumer product be "for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise," would on its face seem to preclude the possibility that housing was intended to be within the Commission's jurisdiction. This natural reading of the statutory language is confirmed in the legislative history. *See, e. g.,* 118 Cong.Rec. 21897–901 (1972) (Senate debate preceding the defeat of an amendment to include mobile homes within CPSC's jurisdiction). The Commission conceded its lack of jurisdiction over housing at oral judgment.

a statutory scheme that carefully limits the scope of the agency's authority.[20]

■ 4. *Requirement that product be "customarily" sold to consumers as a distinct article.* Since housing as such is not a consumer product, a component part of a residence—its aluminum branch circuit wiring system—cannot qualify as a consumer product unless it is produced or distributed as a distinct article of commerce. The legislative history makes clear that when a consumer buys all of the component parts of an aluminum branch circuit wiring system, and then puts together the system himself, for his own use, the resulting product is not within the definition of "consumer product." [21] Nor does the Act cover aluminum branch circuit wiring systems merely because they are purchased as a compo-

nent part of a house, for a house is not a consumer product. But the definition may apply if the wirings systems are bought separately by consumers—one may hypothesize consumers who act as their own general contractors in residential construction, and contract with electricians to install the wiring systems.[22] Nevertheless, if such situations are rare and out of the ordinary they would not suffice to ground the Commission's jurisdiction.

■ Subsection 3(a)(1)(A) provides that the term "consumer product" does not include: "any article which is not customarily produced or distributed for sale to, or use or consumption by, or enjoyment of, a consumer." [23] Apparently one motivation for this provision was to exclude "industrial products" from the Commission's jurisdiction,[24]

20. The following colloquy occurred at oral argument:

THE COURT: [U]nder your theory, what component of a house would not be subject to regulation by the Commission?

COUNSEL FOR THE COMMISSION: Your Honor, there may be many components that the Commission may not—

THE COURT: Can you name one?

COUNSEL FOR THE COMMISSION: Yes, Your Honor, a 2 by 4 may not be subject to the Commission's regulations.

THE COURT: Why not?

COUNSEL FOR THE COMMISSION: Because it may present absolutely no reason for the Commission to regulate.

THE COURT: Well—

COUNSEL FOR THE COMMISSION: No, Your Honor, what I am trying to say is that there may be many products within the household environment that are not consumer products within the definition.

THE COURT: Such as what?

COUNSEL FOR THE COMMISSION: Well—

THE COURT: Under your theory.

COUNSEL FOR THE COMMISSION: Your Honor, there may be a brick.

THE COURT: Pardon?

COUNSEL FOR THE COMMISSION: A brick, which is not transported in interstate commerce—made in a local jurisdiction. Now, that brick may not present any case for federal jurisdiction.

THE COURT: Suppose you conclude it does?

COUNSEL FOR THE COMMISSION: Well, if we conclude that it does, it possibly would be a consumer product.

21. "The definition [of consumer product] does not include products produced solely by an individual for his own personal use, consumption or enjoyment." Report of the Senate Commerce Committee on CPSA, S.Rep.No.92–749, 92d Cong., 2d Sess. 12 (1972).

22. The Act defines "manufacture" in the following manner: "The term 'manufactured' means to manufacture, produce, or assemble." CPSA § 3(a)(8), 15 U.S.C. § 2052(a)(8) (1976). It is clear that the electrical contractor is a manufacturer of an aluminum branch circuit wiring system. We do not decide if manufacturers of a product's component parts are to be considered manufacturers of the product as well.

23. Although the definition has a number of exceptions, particular prominence was given to this exception in the Conference Committee Report:

The House amendment defined "consumer product" as any article, or component part thereof, produced or distributed for sale to, (or for the personal use, consumption, or enjoyment of) a consumer in or around a household or residence, a school, in recreation, or otherwise; unless the article is not customarily produced or distributed for sale to or use, consumption, or enjoyment of a consumer.

Report of the Conference Committee on CPSA, H.R.Rep.No.92–1593, 92d Cong., 2d Sess. 37 (1972), U.S.Code Cong. & Admin.News 1972, pp. 4596, 4629.

24. See H.R.Rep.No.92–1153, 92d Cong., 2d Sess. 27 (1972).

but the provision is not so defined. The limitation on jurisdiction applies whenever the production for sale or use by a consumer is only occasional and is not customary. Conversely, if a product is customarily sold or otherwise distributed to consumers, then it remains a "consumer product" notwithstanding that a large portion of the product's distribution is for industrial purposes.[25] Jurisdiction does not require a showing that a majority of product sales are to consumers, but there must be a significant marketing of the product as a distinct article of commerce for sale to consumers or for the use of consumers before the product may be considered as "customarily" produced or distributed in that manner.[26]

▆ We are dealing here not with an exemption, which often triggers the conception that the burden is on the one claiming the exemption, but with a provision defining jurisdiction—it includes A, but not B. The Commission's jurisdiction is ultimately dependent on a determination that aluminum branch circuit wiring systems are customarily sold or otherwise distributed to consumers as distinct articles of commerce. While this appears unlikely, it is inappropriate to take judicial notice of the nonexistence of such a jurisdictional fact. This determination should be made in the first instance by the agency. We remand to the district court for further consideration. It should first inquire whether the Commission has made the jurisdictional findings necessary to bring an action maintainable only as to a consumer product. If the agency has undertaken the requisite analysis, the court should conduct appropriate review. If the agency has not made the

analysis necessary for jurisdiction, the district court will enter an appropriate order.[27]

**B. Collateral Estoppel Effect of Decision of Delaware District Court**

The district court dismissed the Commission's complaint as to Kaiser Aluminum & Chemical Corp. because it felt constrained to give collateral estoppel effect to Judge Stapleton's jurisdictional ruling in *Kaiser Aluminum & Chemical Corp. v. CPSC*, 428 F.Supp. 177 (D.Del.1977).

▆ A ruling for which collateral estoppel effect is sought must have been essential to the judgment in a prior proceeding. 1B J. Moore, Federal Practice ¶ 0.441[2], at 3777 (1974); *see* Restatement of Judgments § 70, Comment b (1942). The jurisdictional question in this case is whether aluminum branch circuit wiring systems are "consumer products." This was not the issue before the Delaware district court. A fair reading of Judge Stapleton's decision makes clear that the only issue actually litigated in Delaware related to aluminum wiring, a distinct product from the one involved in this case. The dicta relating to aluminum branch circuit wiring systems were unnecessary to the judgment in the Delaware case. For the same reason, the Third Circuit's ruling on appeal, *Kaiser Aluminum & Chemical Corp. v. CPSC*, 574 F.2d 178 (3d Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 218, 58 L.Ed.2d 193 (1978), is not entitled to effect on the basis of collateral estoppel in this case. We find the doctrine of collateral estoppel inapplicable, and vacate this portion of the ruling so that the district court may proceed as to Kaiser in the same manner it finds appropriate as to the other defendants.

*Remanded for further proceedings.*

**25.** A separate section of the Act, CPSA § 31, 15 U.S.C. § 2080 (1976), deprives the Commission of authority to regulate industrial products in certain cases. That section provides in part:
> The Commission shall have no authority under this chapter to regulate any risk of injury associated with a consumer product if such risk could be eliminated or reduced to a sufficient extent by actions taken under the Occupational Safety and Health Act of 1970.

**26.** *See* H.R.Rep.No.92–1153, 92d Cong., 2d Sess. 27 (1972).

**27.** As we have noted, the Commission's investigative or rulemaking authority with respect to aluminum wiring systems is not determined by the resolution of the question involved in this case. In the event of a finding that one or more component parts of these wiring systems qualifies as a consumer product, there would be a jurisdictional basis for investigation or rulemaking on the subject. *See* text accompanying notes 12 and 13 *supra*.