The STATE FAIR OF TEXAS, Plaintiff-Appellant, Cross-Appellee,

Steck & Stapf Attractions, Inc., Plaintiff-Appellant, Cross-Appellee,

v.

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION, Defendant-Appellee, Cross-Appellant.

No. 80-1006.

United States Court of Appeals, Fifth Circuit. Unit A

June 30, 1981.

Vial, Hamilton, Koch, Tubb, Knox & Stradley, Jeffrey S. Lynch, Gerald R. Powell, Dallas, Tex., for plaintiff-appellant, cross-appellee.

Robert B. Nicholson, Daniel J. Conway, Antitrust Div., U. S. Dept. of Justice, Washington, D. C., for defendant-appellee, cross-appellant.

Kelly, Hart & Hallman, Edmund Glen Johnson, Fort Worth, Tex., David M. Kendall, Jr., Thompson & Knight, Austin, Tex., Russell B. Smith, Dallas, Tex., for State Fair of Tex.

Before GOLDBERG, AINSWORTH and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Among the attractions offered visitors to the State Fair of Texas is the opportunity to take a trip on the "Swiss Skyride." Skyride passengers travel in open gondolas, moving along a single cable, over the fairgrounds and enjoy a panoramic prospect. The Skyride is owned by the State Fair, but operated by Steck & Stapf Attractions, a lessee. Manufactured in Switzerland by Van Roll, Ltd., the attraction has been bought by several amusement parks around the country.

Two recent Skyride accidents, one occurring at the State Fair, prompted the United

States Consumer Product Safety Commission to obtain an administrative search warrant authorizing an on-site inspection of the Skyride and an examination of relevant documents in the possession of the State Fair and Steck & Stapf. The State Fair and Steck & Stapf sued to prevent the Commission from conducting its investigation. Concluding that the Skyride is a "consumer product" within the meaning of the Consumer Product Safety Act, we uphold the Commission's authority to conduct the investigation.

## I.

The accident at the State Fair occurred on October 21, 1979. Four gondolas collided, falling to the ground and killing one passenger. A similar accident at a Missouri amusement park had caused three fatalities and led to an investigation of this type of ride by the Consumer Product Safety Commission. As part of its investigation, the Commission served the State Fair with a notice of inspection [see 16 C.F.R. § 1118.2 (1980)] seeking access to the Skyride and to relevant records. The State Fair and Steck & Stapf allowed a Commission engineer to view the ride from a distance, but would not allow him to inspect it more closely or to examine the documents.

To prevent further action by the Commission, the State Fair and Steck & Stapf filed separate suits, later consolidated, seeking a declaratory judgment that the Skyride is not a "consumer product" and, therefore, beyond the Commission's jurisdiction. They also sought an injunction against further Commission attempts to inspect the ride. Finding no irreparable injury was threatened until the Commission obtained a search warrant enabling it to disregard the

plaintiffs' refusal to cooperate, the district court held that the controversy was not yet ripe for judicial decision. The court retained jurisdiction, anticipating the search warrant that was later issued by a federal magistrate. When they again refused to permit inspection, the Commission sought an order to show cause why it should not be permitted to conduct the inspection as the warrant authorized.

The district court affirmed the magistrate's denial of the injunctive relief sought by plaintiffs. In all other respects, however, plaintiffs were granted the relief sought. The district court affirmed the denial of the Commission's motion for an order to show cause, granted the plaintiffs' motion to quash the warrant, and entered a declaratory judgment in favor of plaintiffs. Plaintiffs' victory was nonetheless partial. The court held that the Skyride is a consumer product under the Act and granted plaintiffs relief only because the Commission had not presented sufficient facts establishing authority to enter the premises. See 15 U.S.C. § 2065(a). The Commission could thus continue its investigation, although at a distance.

Neither side is content with this decision.[1] State Fair and Steck & Stapf challenge the characterization of the Skyride as a consumer product, while the Commission argues that it has authority to inspect the premises and records.

## II.

■ To justify issuance of an administrative search warrant, the Commission must make some showing that it has statutory authority to conduct the investigation. Relying on *Marshall v. Barlow's Inc.*, 436 U.S.

---

1. The judgment is final and appealable. The district court's statement that its dismissal of the Commission's suit was "without prejudice to further application for a warrant under other circumstances," *State Fair of Texas v. United States Consumer Product Safety Commission*, 481 F.Supp. 1070, 1082 (N.D.Tex.1979), holding out the possibility of a subsequent suit unhindered by *res judicata*, did not rob the judgment entered of its finality in resolving all of the issues then before the court. *Cf. F. T. C. v.*

*Texaco, Inc.*, 517 F.2d 137, 143 n.6 (D.C.Cir. 1975), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977), holding that the mere possibility of reconsideration upon presentation of additional facts does not rob a judgment already entered of finality. *Compare Broussard v. Lippman*, 643 F.2d 1131 (5th Cir. 1981), in which a district court order was held not final because it predicated entry of judgment upon the occurrence of a condition precedent.

307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), the district court concluded that the Commission "must be able to demonstrate its own jurisdiction." *State Fair of Texas v. United States Consumer Product Safety Commission*, 481 F.Supp. 1070, 1076 (N.D.Tex. 1979). The Commission, citing pre-*Barlow's* cases, argues that a reviewing court should assure itself only that statutory authority for the warrant is not obviously lacking. *See American General Insurance Co. v. F. T. C.*, 496 F.2d 197, 200 (5th Cir. 1974).

■ The Fourth Amendment's prohibition of unreasonable searches and seizures applies to administrative searches as well as criminal investigations. *Donovan v. Dewey*, —— U.S. ——, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981); *Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). *See Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). In *Barlow's*, the Court held that, except in unusual circumstances, warrantless searches of commercial premises are inherently unreasonable and, therefore, interdicted by the Fourth Amendment. To secure a warrant, the agency must show "probable cause" that it should be issued. As Justice White noted, "[p]robable cause in the criminal sense is not required," 436 U.S. at 320–21, 98 S.Ct. at 1824, 56 L.Ed.2d at 316, but the agency must show that:

the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria.

*Id.* at 323, 98 S.Ct. at 1826, 56 L.Ed.2d at 318. The plaintiffs contest only the Commission's statutory authority and do not challenge the constitutionality of the search or the existence of an appropriate administrative plan.

In deciding whether the district court properly granted plaintiffs' motion to quash the warrant, we must determine what showing of statutory authority is sufficient to justify issuance of a warrant. As with most Fourth Amendment issues, we determine the applicable standard by weighing the legitimate expectations of privacy regarding the object of the search against the level of intrusion on that privacy. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Wanger v. Bonner*, 621 F.2d 675 (5th Cir. 1980).[2]

It follows that the balance may be different depending on the kind of property that is to be searched, the place where it is located, and the degree of intrusiveness the search entails. We put different considerations on the scales when we consider the examination of private papers and the inspection of property that is usually in plain view.

■ Both plaintiffs have a significant privacy interest in the documents that are in their respective possession because these materials are kept in a private file away from public view. We agree with the district court that a search warrant is "the most disruptive of the arrows in this investigatory quiver," *State Fair of Texas v. United States Consumer Products Safety Commission*, 481 F.Supp. at 1076, because the warrant would enable the inspectors to search these files for themselves. Accordingly, we hold that, in order to obtain a warrant for the documents, the Commission must demonstrate clear, not merely plausible, statutory authority.

■ Unlike the documents, the Skyride stands entirely visible to the public. What is in "plain view" receives little or no Fourth Amendment protection because the owner's expectation of privacy is minimal. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *United States v. Jonas*, 639 F.2d 200 (5th Cir. 1981). *See Donovan v. Dewey*, —— U.S. ——, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (Rehnquist, J., concurring). The Commission

---

**2.** *See Donovan v. Dewey*, · U.S. ···, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981); *Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

seeks only to examine the Skyride machinery more closely than a fairgoer could. We take judicial notice that some of the machinery may be shielded or enclosed for safety or functional purposes but the record contains no evidence that it is purposely hidden from public view. In the absence of a command to shut down the ride's operation, a warrant to examine its machinery has little disruptive effect on the owner's business and strips little, if any, secrecy cloak.[3] Inspection of the Skyride, is, therefore, governed by the lesser standard: a warrant to inspect premises shielded by a minimal privacy interest need only be not "plainly incompetent to any lawful purpose." *See Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed.2d 424, 429 (1943).

### III.

The provisions of the Consumer Product Safety Act, 15 U.S.C. § 2051 *et seq.* determine the Commission's authority to obtain a warrant to inspect the relevant documents. Concluding that the Commission clearly proved its statutory authority to conduct this search under the demanding standard applicable to the documents, we do not test its authority by the lesser standard applicable to the Skyride.

### A. THE SKYRIDE IS A CONSUMER PRODUCT

The Act covers more than toasters and other small household appliances. Congress defined the term "consumer product" expansively to include any article, or component part thereof, produced or distributed

(i) *for sale* to a consumer for use in or around a permanent or temporary

household or residence, a school, in recreation, or otherwise, or

(ii) *for the personal use*, consumption, or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise; . . . . [4]

15 U.S.C. § 2052(a)(1) (emphasis supplied). The statute thus embraces not only merchandise produced "for sale to a consumer," but also those articles that consumers do not ordinarily buy, but nonetheless use. The hallmark of the Commission's authority is *not the customer's legal relation to a* product, but the consumer's physical exposure to it. *See* H.R.Rep.No.92–1153, 92d Cong., 2d Sess. 27 (1972); *Consumer Product Safety Commission v. Chance Manufacturing Co.*, 441 F.Supp. 228, 233 (D.C.D.C. 1977).

The term "personal use" is, of course, modified. The article must be produced for use "in or around a . . . household or residence, a school, in recreation or otherwise." When the entire second paragraph of the definition is read literally, it encompasses the Skyride; the Skyride is an "article . . . produced or distributed . . . for the personal use . . . or enjoyment . . . of a consumer . . . in recreation." The House Report accompanying the Act substantiates this interpretation. It states that Subpart (ii) "also" includes:

products which are primarily or exclusively sold to industrial or institutional buyers . . . so long as they were produced for the *use* of consumers.

H.R.Rep.No.92–1153, 92 Cong., 2d Sess. 27 (1972) (emphasis and ellipsis in the original).

Of course, plaintiffs challenge this reading,[5] but we cannot ignore the usual signifi-

---

**3.** *Barlow's, See* and *Camara* all involved premises where the owner had a high expectation of privacy. *Barlow's* involved the company's "working area"; *See,* a warehouse; and *Camara,* an apartment. Our situation is analogous to an exception discussed in *Barlow's* and applied in *Donovan v. Dewey.* Like a pervasively regulated corporation, the owner and operator of the Skyride have consented to the constant examination of their premises by outsiders.

**4.** The statute then lists nine classes of exceptions to this inclusive language. *See* 15 U.S.C. § 2052(a)(1)(A)–(I).

**5.** The complexity of this issue may be inferred from the lack of consensus among those judges who have already considered it. Two judges have decided that the Skyride is a consumer product and a third would reach the same conclusion. *See Robert K. Bell Enterprises, Inc. v. Consumer Product Safety Commission*, 484 F.Supp. 1221 (N.D.Okl.1980), *rev'd*, 645 F.2d 26

cance of the language employed, the legislative history of subpart (ii) and the broad remedial policy underlying the Act.

### 1. The Skyride is an "Article"

 Steck & Stapf argues that the Skyride is not an "article" because it is too large to be exchanged between consumers. The only authority cited to support this extremely limited interpretation is *Webster's* definition of an article as a "commodity." *Webster's New World Dictionary* 42 (1969). If *Webster's* definition is controlling, it designates the Skyride. The Skyride is certainly a commodity, a tangible item capable of being sold. Moreover, *Webster's* also defines commodity as "article of commerce." If there be a distinctive difference between the words, we are unable to discern it. That Congress found it necessary to exempt aircraft and boats from the definition of consumer product, 15 U.S.C. § 2052(a)(1)(F)–(G), indicates that size is not a defining limitation to the term "article." [6] Be it ever so large, the Skyride is an article.

### 2. The Skyride is "Distributed"

The State Fair contends that the Skyride is not "distributed" because it is not customarily sold directly to consumers. This argument is answered by the words of the provision to which the State Fair alludes. Section 2052(a)(1)(A), describing the first of the nine excepted classes of products excludes from the Commission's authority:

> any article which is *not customarily* produced or *distributed for* sale to, or *use or*

consumption by, *or enjoyment of,* a consumer. (Emphasis supplied)

15 U.S.C. § 2052(a)(1)(A). We have no cause to ignore the unaccommodating words italicized; the Skyride has been "customarily" distributed—to amusement parks—for "use ... or enjoyment of" consumers.

*ASG Industries, Inc. v. Consumer Product Safety Commission,* 593 F.2d 1323 (D.C.Cir. 1979), *cert. denied,* 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979), and *Consumer Product Safety Commission v. Anaconda Co.,* 593 F.2d 1314 (D.C.Cir.1979), cited by the State Fair, are not to the contrary. Each turns on the court's conclusion that housing is not a consumer product. *ASG* involved architectural glazing materials, while *Anaconda* involved aluminum wiring circuits, both products incorporated into housing. Consumers do not "use" these products until they have been incorporated into the exempted structure and are no longer used separately from their use as part of the whole. In both cases, however, Judge Leventhal noted that products "customarily ... used by consumers" are not exempted. *ASG,* 593 F.2d at 1328; *Anaconda,* 593 F.2d at 1322. *See Kaiser Aluminum & Chemical Corp. v. United States Consumer Product Safety Commission,* 574 F.2d 178 (3d Cir. 1978), *cert. denied,* 439 U.S. 881, 99 S.Ct. 218, 58 L.Ed.2d 193 (1978).[7]

The language of Section 2052(a)(1)(A) is unambiguous. *ASG, Anaconda* and *Kaiser* confirm that a product customarily distrib-

---

(10th Cir. 1981) (Wienshienk, J., dissenting); *State Fair of Texas v. United States Consumer Product Safety Commission,* 481 F.Supp. 1070 (N.D.Tex.1979), *rev'd on other grounds* herein. *See* also *Consumer Product Safety Commission v. Chance Manufacturing Co.,* 441 F.Supp. 228 (D.C.D.C.1977), holding that the "Zipper," an amusement park ride, is a consumer product. Three judges have held that the Skyride is not a consumer product. *See* majority opinion of two judges in *Robert K. Bell Enterprises, Inc. v. Consumer Product Safety Commission,* 645 F.2d 26 (10th Cir. 1981); *Walt Disney Productions v. United States Consumer Product Safety Commission,* No. 79–0170–LEW(Px) (S.D. Cal. April 18, 1979), *rev'd on other grounds,* No. 80 1006 (9th Cir. May 4, 1981).

6. The Congressional purpose in using "article" was identified by Judge Leventhal in *Consumer Product Safety Commission v. Anaconda Co.,* 593 F.2d 1314, 1319 (D.C.Cir.1979):

> Congress contemplated an object produced or distributed as a distinct article of commerce, rather than any physical entity that might exist only at an intermediate stage of production.

7. In *Kaiser,* the Third Circuit, using a different analysis, held that aluminum wiring circuits were customarily used by consumers and were not excepted under Section 2052(a)(1)(A).

uted for use by consumers is not exempt from the Commission's authority.

### 3. The Skyride is Used by Consumers

The statutory phrase "for the personal use, consumption or enjoyment of the consumer" poses perhaps the most difficult question of interpretation raised by the congressional definition of consumer product. In the common sense of the word, consumers "use" the Skyride, in that they "enjoy, hold, occupy, or have some manner of benefit" from the product. *Black's Law Dictionary* 1710 (4th ed. 1968) (defining "Nontechnical Sense"). *See* 2 E. Weekly, *An Etymological Dictionary of Modern English* 1574 (1967). Taking the term as defined in *Webster's Seventh New Collegiate Dictionary* 978 (1965), a common desk-top reference book, the passenger "avail[s] oneself of" the ride, for "use implies availing oneself of as a means to an end." Not only do passengers literally occupy the Skyride, but they also enjoy it for sightseeing and benefit from being transported.

Steck & Stapf argues that, because consumers do not exercise control over the particular gondola in which they ride, they do not "use" the Skyride. Surprisingly, two courts have accepted this argument. *See Robert K. Bell Enterprises, Inc. v. Consumer Product Safety Commission*, 645 F.2d 26, 29 (10th Cir. 1981); *Walt Disney Productions v. United States Consumer Product Safety Commission*, No. 79–0170–LEW(Px), slip op. at 6 (C.D.Cal. April 18, 1979), *rev'd on other grounds*, No. 79–3435 (9th Cir. April 22, 1981). Neither opinion cites any legislative history to support such a narrow

and unusual reading of "use" in contradiction to the common understanding of its meaning. One court has found that no evidence supports their interpretation. *Consumer Product Safety Commission v. Chance Manufacturing Co.*, 441 F.Supp. 228, 233 (D.C.D.C.1977).

If we created this requirement *sua sponte*, we would also ignore that portion of the House Report including as consumer products those products sold to institutions for the use of consumers. The power of consumers to control articles sold to and owned by an institution will usually be limited.[8] Precisely because they cannot control the product, consumers may face even greater risks of injury. It certainly becomes more difficult for them to determine for themselves the risks posed by its use. In the absence of any evidence of a contrary congressional intent, we cannot assume that Congress excluded products falling within the language of the statute and contemplated by the legislative history.

■ We are more troubled by an apparent redundancy in the definition. We find it difficult to imagine a product "sold" to consumers, but not "used" by them.[9] Even the restrictive definitions urged by State Fair and Steck & Stapf do not eliminate this redundancy. Ordinarily, we avoid treating statutory language as surplusage. *Ideal Mutual Insurance Co. v. C. D. I. Construction Inc.*, 640 F.2d 654, 658 n.7 (5th Cir. 1981). In this instance, however, Congress may have tolerated tautology. The Senate version of the Consumer Product Safety Act limited its definition to products "sold" to consumers.[10] The House bill also used

---

**8.** Consider, for example, a glass basketball backboard sold only to schools and arenas. Players have no "control" over the backboard, yet face a significant risk of injury if the glass plate shatters easily.

**9.** In *ASG* and *Anaconda*, Judge Leventhal found that homeowners did not directly use architectural glazing materials and aluminum circuits sold to the homebuilder. In holding that consumers customarily bought the former and remanding for a finding whether they used

the latter, he did not negate the possibility that consumers who bought these products used them.

**10.** S. 3419, 92d Cong., 2d Sess. § 101 (1972). The district court in *Walt Disney Productions* erroneously relied on the report accompanying this bill. *See* slip op. at 5, *citing* S.Rep.No.92–835, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News 4573.

the language now constituting subpart (i), but added the additional language regarding "personal use" embodied in subpart (ii).[11] In its desire for "an assurance of comprehensiveness," *ASG Industries*, 593 F.2d at 1328, the House employed its more "broadly stated" definition, H.R.Rep.No.92–1153, 92d Cong., 2d Sess. 27 (1972), without considering to what degree it overlapped the Senate definition. *See id.* The effort to avoid lacunae by seeking embraciveness may easily result in overlapping coverage. Without any evidence that Congress, in passing the House version, intended "sold" to have independent significance, we decline to fabricate a tortured distinction.

### 4. The Skyride is Used in Recreation

Both plaintiffs assert that the Skyride is used only as a means of transportation, not as a form of recreation. The district court found that the ride was "intended for the enjoyment of recreation-minded consumers." 481 F.Supp. at 1077. Plaintiffs have not shown that this finding is clearly erroneous. *See Robert K. Bell Enterprises, Inc. v. United States Consumer Product Safety Commission*, 484 F.Supp. 1221, 1225 (N.D. Okl.1980), *rev'd on other grounds*, 645 F.2d 26 (10th Cir. 1981), which quotes promotional literature describing the Skyride as "an attraction in itself."

The plaintiffs then pose a more challenging argument. They construe "in recreation" to modify the immediately preceding language rather than to provide an additional basis for considering an item as a consumer product. The relevant portion of Section 2052(a)(1)(ii) states that a consumer product is used, enjoyed or consumed:

> in or around a permanent or temporary household or residence, a school, in recreation, or otherwise. . . .

This interpretation reads the phrase "in recreation" to refer only to household or school products used "in recreation [ ] or otherwise." Plaintiffs urge that, if "in recrea-

tion" provides an independent basis whereby a product becomes "consumer," then the word "otherwise" also provides an independent basis whereby the statute includes every product imaginable. (Plaintiffs provide a parade of spectres for our edification.) Further, according to the plaintiffs, the references to "household or residence" would be rendered surplusage, subsumed by "otherwise."

With the court in *Chance Manufacturing*, we find this interpretation "unduly strained." 441 F.Supp. at 233. The insertion of a comma after "recreation" indicates that the word was part of the preceding series, rather than functioning with "otherwise" as an independent adjectival phrase and thus limiting "consumer products" to those used in recreation or otherwise in a household, residence or school. Further evidence that use "in recreation" provides a separate basis for including a product comes from the list of exceptions to Section 2052(a)(1)'s definition of "consumer product." That Congress explicitly exempted aircraft and boats, *see* 15 U.S.C. § 2052(a)(1)(F)–(G), indicates congressional belief that these products, having no connection with school or household, would otherwise have fallen within the general definition.

We imply no insight as to the precise meaning of the term "otherwise" in this context. As a matter of diction, it is not redundant with the items in the preceding series because, by definition, it refers only to "other" items. However, we are not required to read this statute as if it were a wonderfully constructed jig-saw puzzle, with each word having only one precise place, yielding, when assembled, an unambiguous picture. The statute was not so constructed, as the legislative history indicates. It seems likely that "otherwise" was inserted as "an assurance of comprehensiveness," to use Judge Leventhal's phrase. *ASG*, 593 F.2d at 1328. This case does not require us to announce that any non-indus-

11. H.R. 15003, 92d Cong., 2d Sess. § 3.

trial product [12] posing hazards to individuals constitutes a consumer product. That issue is simply not before us because the Skyride falls within one of the stated bases of the Commission's jurisdiction.

### 5. Other Statutory Provisions Do Not Compel Plaintiffs' Interpretation

The Act authorizes the Commission to acquire free samples of imported consumer products and purchase domestic consumer products at cost. *See* 15 U.S.C. § 2066, 2076. Steck & Stapf argues that, because the Commission is unlikely to acquire the Skyride in either manner, the ride is not a consumer product.[13] We find this argument unpersuasive. Both sections are permissive; they enable the Commission to obtain sample products, but do not suggest that the Commission's jurisdiction is limited to products that it may thus acquire. Such a limitation would be puzzling. The Commission will usually be fiscally unable to acquire products as expensive or as large as the Skyride. Yet large and costly products pose hazards to consumers indistinguishable from the hazards posed by those that are small and inexpensive.[14] Absent legislative history or other explicit evidence that Congress intended this distinction, we refuse to read it into the statute.

■ Both plaintiffs argue that the narrower definition of "consumer product" in the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, controls the definition contained in Section 2052(a)(1). The Warranty Act defines consumer product "for the purposes of this chapter" as:

> tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes.

15 U.S.C. § 2301(1). Unlike the Consumer Product Safety Act, the Warranty Act is concerned with fraud, the release of financial information, and contractual rights. Because the Warranty Act is concerned only with household products actually sold to consumers, Congress consciously chose to employ a more limited definition. Two acts with different purposes need not be construed *in pari materia. United Shoe Workers v. Bedell*, 506 F.2d 174, 188–89 & n.96 (D.C.Cir.1974); *Latimer v. Sears, Roebuck & Co.*, 285 F.2d 152, 157 (5th Cir. 1960).

Steck & Stapf also cites definitions of "consumer product" in the Fair Packaging and Labeling Act, *see* 15 U.S.C. 1459(a), and the Energy Policy and Conservation Act, *see* 42 U.S.C. § 6291(a)(1). In each of these statutes, Congress has chosen to use the same term, "consumer product," but to define it differently in each instance. Each definition reflects the basic concerns of the legislation in which it is found. Without any evidence that these different definitions are interrelated, we refuse to assume that each of these different definitions has the same meaning. Indeed, if we did, we would have difficulty deciding which definition controls the others. We conclude that none of the provisions suggested by plaintiffs would limit Section 2052(a)(1)'s definition of "consumer product."

### 6. The Legislative History of the Act Does Not Exclude the Skyride

■ Both plaintiffs rely on legislative history indicating that Congress was concerned with the hazards posed by small household products to argue that Congress was concerned only with small products. *See, e. g.*, 118 Cong.Rec. 21847 (1972) (remarks of Sen. Percy); *id.* at 31375 (remarks

---

**12.** *See* H.R.Rep.92–1153, 92d Cong., 2d Sess. 27, stating that "industrial products" are excluded.

**13.** This argument found favor in California. *See Walt Disney Productions v. United States Consumer Product Safety Commission*, No. 79–0170-LEW(Px), (S.D.Cal. April 18, 1979) *rev'd*

*on other grounds*, No. 80-1006 (9th Cir. May 4, 1981).

**14.** That Congress found it necessary to exempt airplanes from Section 2052(a)(1)'s definition of consumer product suggests that neither cost nor size, of themselves, exclude a product.

of Cong. Staggers). Without doubt, many congressmen spoke primarily in terms of small household products when discussing the Act. Their statements, while addressing a central concern, do not purport to describe the limits of the Act's reach. The language of Section 2052(a)(1) suggests a much broader scope. A small facet of a larger problem will frequently capture the attention of Congress. Even though much of its discussion may involve the aspect that initially gained congressional attention, Congress, in the end, frequently passes a statute dealing comprehensively with the larger problem.[15] Lacking specific evidence that the expansion of Congressional concern embodied in Section 2052(a)(1)'s language is only apparent, we must give full effect to the language as written. A statute governs all of the circumstances falling within its purview, not only those that prompted its enactment.

We find the House Report statement that the statute includes "products sold to . . . institutional buyers . . . for use of consumers," quoted *supra*, more probative of congressional intent. Unlike the comments cited by the plaintiffs, this language deals directly with the limits of Section 2052(a)(1)'s definition of consumer product, as does the Report's exhortation that we construe the definition broadly. On balance, the legislative history favors the conclusion that the Skyride does not transcend the periphery of the Commission's expansive domain.

7. The Policy of the Act Favors Inclusion of the Skyride as a Consumer Product

In 15 U.S.C. § 2051, Congress specified the findings and purposes underlying the

Act. These statements announce a broad remedial purpose. In addition, several bear specifically on the question before us. The primary justification for creating the Commission is expressed in the second finding.

(a) The Congress finds that—

(2) complexities of consumer products and the diverse natures and abilities of the consumers using them frequently result in an inability of users to anticipate risks and to safeguard themselves adequately.

15 U.S.C. § 2051(a)(2). If small household appliances pose risks beyond the ability of the average consumer to evaluate, a large and far more complicated machine like the Skyride may pose even greater hazards, yet consumers have neither the technical expertise nor any real opportunity to evaluate the risks involved. In reality, only the institutional purchaser can effectively inquire into the risks posed by a product like the Skyride. The House Report statement that the statute includes products bought by institutions for consumer use indicates that Congress was unwilling to rely on the institutional buyer alone to ensure that consumers do not face unreasonable risks.

The fourth finding states that local government regulation of unreasonable risks posed by consumer products is "inadequate." 15 U.S.C. § 2051(a)(4). This disposes of plaintiffs' contention that Dallas Building Code regulations governing the Skyride exempt the product from the Commission's authority.[16]

The Act's "purposes" also favor inclusion of the Skyride.

(b) The purposes of this chapter are—

(1) to protect the public against unreasonable risks of injury associated with consumer products;

---

15. Section 1983 of the Civil Rights Acts, 42 U.S.C. § 1983, provides an illustration of the paradigm. Although enacted in response to persecution of blacks during Reconstruction, it applies to every deprivation of constitutional rights under color of state law. *See, e. g., Mitchum v. Foster*, 407 U.S. 225, 238–242, 92 S.Ct. 2151, 2160–62, 32 L.Ed.2d 705, 715–717

(1972); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 402 (1961).

16. That the regulations are found in a building code does not transform the Skyride into a house. (In *Anaconda*, the court held that housing was not a consumer product under the Act. *See* 593 F.2d at 1320.) We take judicial notice that a Skyride is not a home.

(2) to assist consumers in evaluating the comparative safety of consumer products;

(3) to develop uniform safety standards for consumer products and to minimize conflicting State and local regulations;

(4) to promote research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries.

15 U.S.C. § 2051(b). An effective Commission investigation improving the safety of the Skyride would serve each of these ends. The relevance of the fourth finding is especially obvious. Consumers have died while using the Skyride; the protection of others who may use them cannot be assured by awaiting a personal injury action to determine fault. The manufacturers and owners whose products have already been involved in serious injuries to consumers bear an especially heavy burden in arguing that the Commission lacks jurisdiction.[17]

That burden has not been carried here. We hold that the Skyride is a "consumer product."

## B. THE COMMISSION IS AUTHORIZED TO ENTER THE FAIR GROUNDS

The other statutory issue before us requires less explication. Section 2065(a)(2) of the Act authorizes the Commission

to inspect, at reasonable times and in a reasonable manner such conveyance or those areas of such factory, warehouse, or establishment where such products are manufactured, held, or transported and which relate to the safety of such products.

15 U.S.C. § 2065(a)(2). Section 2052(a)(8) defines manufactured as "to manufacture, produce, or assemble." 15 U.S.C. § 2052(a)(8). The district court concluded that, because neither of the plaintiffs fabricated or assembled the product, the Commission was not authorized to enter their premises.

 Under the two sections, however, the Commission's authority depends not on who assembled (and thus "manufactured") the product, but on where the product was assembled. *Accord, Robert K. Bell Enterprises, Inc. v. Consumer Product Safety Commission*, 484 F.Supp. 1221, 1228 (N.D. Okl.1980), *rev'd on other grounds*, 645 F.2d 26 (10th Cir. 1981). Section 2065(a) speaks of "*areas . . . where such products are manufactured.*" The Skyride was necessarily assembled at the site of the fair, which provides the only location where the Commission may observe the product in action. Whenever a product can be assembled only on the purchaser's site, the Commission must either have the authority to inspect the functioning product there or be in most circumstances unable to inspect it at all. No legislative history mandates that we so limit the Commission's authority. We hold that the Commission may enter plaintiffs' premises to inspect the Skyride and to examine documents.

## IV.

Concluding that the Commission had authority to inspect the Skyride and relevant documents, we grant the following relief:

1. The district court's decision denying plaintiffs injunctive relief is AFFIRMED.

---

**17.** In *Walt Disney Productions v. United States Consumer Product Safety Commission*, No. 79-0170·LEW(Px) (S.D.Cal. April 18, 1979), *rev'd on other grounds*, No. 80–1006 (9th Cir. May 4, 1981), the district court saw the underlying policy considerations differently.

Too expansive a reading of the Act's definition of a "consumer product" could result in the Commission spreading its limited resources too thinly, and might rob consumers of specialized agency expertise that Congress has attempted to guarantee.

Slip op. at 6–7. However, it is not the courts' prerogative to second-guess agency decisions properly within their discretion. *Oilfield Safety and Machine Specialties, Inc. v. Harman Unlimited, Inc.*, 625 F.2d 1248, 1254 (5th Cir. 1980). The Commission is the best judge of what it should accomplish with the means given it by Congress.

2. The declaratory judgment entered in favor of plaintiffs is VACATED.

3. The district court's decision granting plaintiffs' motion to quash the administrative search warrant is REVERSED.

4. The district court's decision denying the Commission's motion for an order to show cause is VACATED, the issue now being moot in the light of this opinion.

AINSWORTH, Circuit Judge, dissenting:

Despite the carefully articulated reasons set forth in the majority opinion which holds that an aerial tramway in an amusement park is within the jurisdiction of the Consumer Product Safety Commission under the Consumer Product Safety Act of 1972, 15 U.S.C. § 2051 *et seq.* (the Act), I continue to believe that the language of the Act itself, interpreted by taking the words as they are commonly and ordinarily understood, as well as the legislative history, dictate the conclusion that the aerial tramway is not a consumer product and not under the Act. Consequently, I dissent.

Whether or not the aerial tramway known as the Skyride is a consumer product, under the jurisdiction of the Act, hinges specifically on the interpretation of the words of Section 2052(a)(1) which defines that term as follows:

> The term "consumer product" means any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise; but such term does not include—
>
> (A) any article which is not customarily produced or distributed for sale to, or use or consumption by, or enjoyment of, a consumer . . . ."

Plaintiffs state (referring to subsection ii) that if each of the four phrases (1) "in or around a permanent or temporary household or residence," (2) "a school," (3) "in recreation," and (4) "or otherwise" provide independent bases of jurisdiction, as the majority now holds, the Act's jurisdiction extends to the entire universe of articles produced for the use or enjoyment of consumers. Thus, under the majority's interpretation, the Act's jurisdiction is virtually limitless in this context. It is true that "or otherwise" is a broad and all-inclusive term, but the phrase "in recreation, or otherwise" should be construed to modify the preceding words "household or residence, a school." Unless such modification is accepted, there can be no sensible reason for Congress including the home and school use provisions which would be mere surplusage under the majority's interpretation since the "or otherwise" term is without restriction.

The Tenth Circuit analyzed the identical statute in *Robert K. Bell Enterprises, Inc. v. Consumer Product Safety Commission*, 645 F.2d 26, 29 (10th Cir. 1981), and concluded that the term "in recreation, or otherwise" did, indeed, modify the home and school use provisions in subsection ii. In my view, this is a more reasonable and proper construction and I would apply it here.

The legislative history of the Act supports the view that consumer products should be restricted to those used at home or at school. In the section of the House Report entitled Basis for Legislation, the Committee made specific reference to the home or household five times in the space of two and one-half pages. H.R.Rep.No. 1153, 92d Cong., 2d Sess. 21–24 (1972). More importantly, the House Report stated, "Within the last six years, the Congress has exhibited an increasing concern with the safety of the products which consumers encounter in their daily lives." In contrast, although many people ride the Skyride each

year, it can hardly be said that an aerial tramway at the State Fair of Texas is the type of product which consumers encounter in their daily lives.[1]

I dissent.

---

1. There is no absence of governmental regulation of the State Fair grounds. Safety of the buildings and structure has been provided for since 1941 under the Dallas City Code. *See* Dallas City Code art. 96- 1 *et seq.* (1941); Dallas City Code § 32–12 *et seq.* (1961).